Filed 3/25/21; modified and certified for partial publication 4/23/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STOP SYAR EXPANSION,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>COUNTY OF NAPA,<br><br>        Defendant and Respondent;<br><br>SYAR INDUSTRIES, INC.,<br><br>        Real Party in Interest and<br>Respondent. | A158723<br><br>(Napa County Super.<br>Ct. No. 16CV001070) |

**INTRODUCTION**

Stop Syar Expansion (SSE) has long opposed the expansion of Syar Industries, Inc.'s (Syar) aggregate operation. Syar filed an application for expansion in May 2008. After more than seven years of environmental review and numerous hearings, the County Planning Commission, in October 2015, certified the final Environmental Impact Report (EIR) and approved a modified project and a permit for an expansion half the size originally sought and subject to more than 100 pages of conditions and mitigation measures. SSE appealed both the EIR certification and the project and permit approvals

1

to the County Board of Supervisions, asserting in the respective appeals that the EIR and the project and permit approvals were deficient in a multitude of respects. After nearly a year of additional environmental review and hearings, the Board, in a 109-page decision, rejected SSE's appeals, certified the EIR, and approved a further modified project and permit.

SSE filed the instant writ proceeding pursuant to Public Resources Code, section 21168,[1] challenging the certification of the EIR. It ultimately winnowed down its claims with respect to the EIR to 16 asserted deficiencies. After briefing by the parties and a hearing, the trial court, in a 42-page ruling, denied the writ petition on a variety of grounds, reaching the merits as to some issues and concluding SSE failed to exhaust administrative remedies as to others.

SSE appeals and, at this juncture, contends the EIR is deficient in five respects. We affirm.

## DISCUSSION[2]

### *Basic CEQA Principles and Standard of Review*

In *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329–330 (*South of Market*), we summarized the relevant CEQA principles and standard of review in a case like this one, where the petitioner's appeal "primarily challenges the content and analysis of the EIR." (*Id.* at p. 329.)

As we explained, the " 'basic purpose of an EIR is to "provide public agencies and the public in general with detailed information about the effect

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

[2] We discuss the pertinent facts and any relevant procedural history in connection with our discussion of the issues raised on appeal.

[that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." ' (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511 . . . (*Sierra Club*).) ' " 'The EIR is the heart of CEQA' and the integrity of the process is dependent on the adequacy of the EIR." ' (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924. . . .)" (*South of Market, supra,* 33 Cal.App.5th at p. 329.)

" ' " ' "[A]n EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise." ' " ' (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275. . . .)" (*South of Market, supra,* 33 Cal.App.5th at p. 329.)

"As our Supreme Court recently explained in *Sierra Club*: 'The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. Section 21168.5 states in part: "In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion." [Citation.] Our decisions have thus articulated a procedural issues/factual issues dichotomy. "[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the

3

reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " ' (*Sierra Club, supra*, 6 Cal.5th at p. 512.)" (*South of Market, supra,* 33 Cal.App.5th at pp. 329–330.)

"The court explained that this 'procedural issues/factual issues dichotomy' has worked well for courts reviewing agency determinations. (*Sierra Club, supra*, 6 Cal.5th at p. 512.) Some procedural questions, such as whether the agency has provided sufficient notice and opportunity to comment on a [draft EIR], or whether it has entirely omitted a required discussion, have clear answers. 'But the question whether an agency has followed proper procedures is not always so clear. This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating "informed agency decisionmaking and informed public participation." ' (*Id*. at pp. 512–513.)" (*South of Market, supra,* 33 Cal.App.5th at p. 330.)

"After reviewing several of its own decisions and those of the Court of Appeal, the court summarized three 'basic principles' regarding the standard of review for adequacy of an EIR: '(1) An agency has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR. (2) However, a reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including " ' "detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." ' "

4

[Citation.] (3) The determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions.' (*Sierra Club, supra*, 6 Cal.5th at pp. 515–516.)" (*South of Market, supra,* 33 Cal.App.5th at p. 330.)

" 'The ultimate inquiry, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." ' (*Sierra Club, supra*, 6 Cal.5th at p. 516.) Generally, that inquiry is a mixed question of law and fact subject to de novo review, but to the extent factual questions (such as the agency's decision which methodologies to employ for analyzing an environmental effect) predominate, a substantial evidence standard of review will apply. (*Ibid.*)" (*South of Market, supra,* 33 Cal.App.5th at pp. 330–331, fn. omitted.)

"Further, ' "[i]n determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project. ([Guidelines,] § 15151.) The CEQA Guidelines further provide that 'the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' ([Guidelines,] § 15151.)" [Citation.] The overriding issue on review is thus "whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public [to] discern from the [EIR] the 'analytic route the . . . agency traveled from evidence to action.' " ' (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262 . . . (*California Oak Foundation*); see *Sierra Club, supra*, 6 Cal.5th at p. 515 ['We also affirm that in reviewing an EIR's discussion, we do not

5

require technical perfection or scientific certainty. . . .'].)" (*South of Market, supra,* 33 Cal.App.5th at p. 331.)

" 'Although an agency's failure to disclose information called for by CEQA may be prejudicial "regardless of whether a different outcome would have resulted if the public agency had complied" with the law (§ 21005, subd. (a)), under CEQA, "there is no presumption that error is prejudicial" (§ 21005, subd. (b)). Insubstantial or merely technical omissions are not grounds for relief. [Citation.] "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 . . .; see *id.* at pp. 464–465 [failure to comply with CEQA's informational mandate 'did not deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside'].)" (*South of Market, supra,* 33 Cal.App.5th at p. 331.)

***General CEQA Exhaustion Principles***

The requirement that administrative remedies be exhausted "is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal." (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589 (*Tahoe Vista*).)

In the context of CEQA, specifically, " ' "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to

6

judicial review." ' [Citations.] Comments must express concerns so the lead agency has ' " ' "its opportunity to act and to render litigation unnecessary." ' " ' [Citation.]." (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623 (*North Coast Rivers*).)

Thus, "the requirement of exhaustion is a jurisdictional prerequisite, and not a matter of judicial discretion." (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 589; accord, *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 184 (*Clews Land*); *North Coast Rivers, supra,* 216 Cal.App.4th at p. 624.)

"Inasmuch as the issue of exhaustion is a question of law, '[a]n appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.' " (*North Coast Rivers, supra,* 216 Cal.App.4th at p. 624; accord, *Clews Land, supra,* 19 Cal.App.5th at p. 185.)

" 'The purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them.' [Citation.] ' " '[Thus,] [r]elatively . . . bland and general references to environmental matters' . . . , or 'isolated and unelaborated comment[s]' " ' do not satisfy the exhaustion requirement. [Citation.] Rather, ' "[t]he 'exact issue' must have been presented to the administrative agency. . . ." ' [Citation.] Requiring anything less 'would enable litigants to narrow, obscure, or even omit their arguments before the final administrative authority because they could possibly obtain a more favorable decision from a trial court.' [Citation.]."[3] (*North Coast, supra,* 216 Cal.App.4th at p. 623;

---

[3] This does not mean an objector must be as specific as an attorney making an objection in a lawsuit. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 629 ["To satisfy the exhaustion

7

accord, *South of Market, supra,* 33 Cal.App.5th at p. 347; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 ["To advance the exhaustion doctrine's purpose '[t]he "exact issue" must have been presented to the administrative agency. . . .' "].)

In the instant case, because the County, by ordinance (Napa County Code, ch. 288), provides for an appeal of actions by the Planning Commission to the County Board of Supervisors, the exhaustion analysis entails a dual inquiry.

*Tahoe Vista* guides this analysis, as the court therein addressed what was then an issue of first impression—"whether a party who raises an issue in the first hearing provided on a project but fails to raise that same issue in an administrative appeal remains free to raise that issue in a subsequent court challenge under section 21177."[4] (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 589.) Following an extensive discussion of both section 21177 and the exhaustion doctrine, the court concluded "section 21177 and the exhaustion

---

requirement, objections a party seeks to raise in a CEQA action must have been made 'known in *some* fashion, however unsophisticated[, in the administrative proceeding].' "].) Nonetheless, the objection must fairly apprise the agency of the substance of the objection so that it has an opportunity to evaluate and respond to it. (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 251 ["To satisfy the exhaustion doctrine, the objections must 'fairly apprise[]' the agency of the purported defect in the EIR."].)

[4] Section 21177 provides in pertinent part: "(a) An action or proceeding shall not be brought . . . unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination. (b) A person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period . . . or before the close of the public hearing on the project. . . ." (§ 21177, subds. (a)-(b).)

doctrine prevent such an issue from being raised in a court action."[5] (*Tahoe Vista,* at pp. 589–592.)

In *Tahoe Vista,* it was undisputed that the "plaintiffs raised their objection to the negative declaration 'during the public comment period' or 'prior to the close of the [Planning Commission's] public hearing on the project before the issuance of the notice of determination.' (§ 21177, subd. (a).)" (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 591.) "Plaintiffs thus had standing to file their petition in the trial court and to prosecute their claim under CEQA *provided* they otherwise exhausted all administrative remedies available to them once the Planning Commission committed what plaintiffs believed was a wrongful act."[6] (*Tahoe Vista*, at p. 591.)

---

[5] The court pointed out, "[s]ection 14.5 of chapter 1514 of the Statutes of 1984, the measure by which section 21177 was enacted, 'states that the "intent of the Legislature in adding Section 21177 . . . [is] to *codify* the exhaustion of administrative remedies doctrine." (Stats.1984, ch. 1514, § 14.5, p. 5345; italics added.) It further provides that "it is not the intent [of the legislation] to limit or modify *any exception* to the doctrine of administrative remedies contained in case law." (*Ibid.,* italics added.) "We are thus directed to read [section 21177] with reference to a specific common law rule." (*Cantor v. Anderson* (1981) 126 Cal.App.3d 124, 129 . . . , citations omitted.) That rule has to do with the law of administrative remedies as it preceded the enactment of section 21177.' (*California Aviation Council* [*v. County of Amador* (1988)] 200 Cal.App.3d [337, 346] (conc. opn. of Blease, J.).)" (*Tahoe Vista, supra,* 81 Cal.App.4th at pp. 589–590.)

[6] The court also explained why the dual requirements of section 21177—that (a) the plaintiff have participated in the administrative proceedings *prior* to the issuance of a notice of determination and (b) the specific issue the plaintiff later raises in a court challenge was raised by someone during those proceedings—are more accurately characterized as establishing "standing" to sue, rather than requiring exhaustion of administrative remedies. (*Tahoe Vista, supra,* 81 Cal.App.4th at pp. 589–590; see *Clews Land, supra,* 19 Cal.App.5th at p. 184, fn. 3 [also stating dual requirements of § 21177 are "separate from" the operation of the exhaustion doctrine where there are "available administrative procedures to challenge"

9

The appellate court then turned to the principal issue—whether the plaintiffs had exhausted their administrative remedies with respect to the issues they sought to raise in their court action. The court explained that " '[c]onsideration of whether such exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question.' (*City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969 . . . ; see also *Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1450 . . . [failure to appeal planning commission's actions 'in the manner prescribed by the town code' constituted failure to exhaust administrative remedies]; *Browning–Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 860. . . .)" (*Tahoe Vista, supra,* 81 Cal.App.4th at pp. 591–592.)

In *Tahoe Vista,* those procedures were provided by section 25.140 of the Placer County Code, which "allows persons who appear at a Planning Commission hearing to appeal the Planning Commission's decision to the Board of Supervisors. The County Code describes the scope of the appeal hearing as follows: 'At the hearing (a hearing conducted "over again"), the appellate body shall initiate a discussion limited to *only* those issues that are the specific subject of the appeal, and, in addition, the specific grounds for the appeal. [For example, if the permit for a project approval or denial has been appealed, the entire project will be the subject of the appeal hearing; however, if a condition of approval has been appealed, then *only* the condition and issues directly related to the subject of that condition will be allowed as part of the discussion by the appellate body.]' (Placer County Code, § 25.140,

the public agency's decision concerning an EIR; the "exhaustion doctrine is separate from, and in addition to, the [statutory] requirements under CEQA"].)

10

subd. D.4.a., italics in original.)" (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 592, first italics added.)

"These procedures thus provided plaintiffs with an appeal from the Planning Commission's decision, but required plaintiffs to specify the particular subject or grounds of the appeal. Although the Board of Supervisors would consider the matter 'over again,' or in legal parlance, de novo, its review was limited solely to those issues the plaintiffs placed before it." (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 592.) The plaintiffs' appeal, however, had placed "only the conditional use permit before the Board of Supervisors and only with regard to parking." (*Ibid.*) The court pointed out the appeal form had "provided a specific notation by which [the] plaintiffs could have appealed the Planning Commission's approval of the negative declaration," but they "did not specify they were appealing the Planning Commission's decision on that point." (*Ibid.*) Such failure "to raise an issue in an administrative appeal after raising the issue in the first public or administrative hearing," said the court, constituted "a failure to exhaust administrative remedies and prevent[ed] the issue from being raised in a subsequent judicial action." (*Ibid.;* see *Clews Land, supra,* 19 Cal.App.5th at pp. 185–187 [where municipal code provided a bifurcated appeals procedure, one applicable to environmental determinations and the other to other kinds of land use decisions, and petitioner did not comply with the former, it "did not exhaust its administrative remedies regarding the [mitigated negative declaration], and it may not now bring a judicial action challenging it"].)

Thus, as *Tahoe Vista* and other cases explain*,* SSE must first demonstrate that it meets the requirements of section 21177—that is, that it participated in the Planning Commission hearings " 'before the issuance of the notice of determination' " and that either it, or another objector appearing

11

during those proceedings, raised the issues SSE has raised in this court action. (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 591; *Clews Land, supra,* 19 Cal.App.5th at p. 184, fn. 3.)

Because the County provides for an appeal of actions by the Planning Commission to the Board of Supervisors, SSE must secondly demonstrate that it exhausted this administrative remedy. (*Clews Land, supra,* 19 Cal.App.5th at pp. 184–187; *Tahoe Vista, supra,* 81 Cal.App.4th at pp. 591–592.) And to determine whether SSE did so, we must look to the County's appeal procedures. (*Clews Land,* at p. 185; *Tahoe Vista,* at pp. 591–592.)

These procedures are set forth in chapter 2.88 of the Napa County Code of Ordinances. An appeal is commenced by filing a "notice of intent to appeal" and paying the required fees "within ten working days of the decision of the approving authority." (Napa County Code. § 2.88.040, subd. (A).) Within "ten working days following the submittal of a notice of intent to appeal," the appellant must submit an "appeal packet." (*Id.*, § 2.88.050, subd. (A).) This packet must, among other things, include "[i]dentification of the specific factual or legal determination of the approving authority which is being appealed, and the basis for such appeal." (*Id.*, § 2.88.050, subd. (A)(4).) "Any issue not raised by the appellant in the appeal packet shall be deemed waived." (*Ibid.*) "If the basis of the appeal is, in whole or in part, an allegation of prejudicial abuse of discretion on the part of the approving authority, that there was a lack of a fair and impartial hearing, or that there were no facts presented to the approving authority to support the decision, such grounds of appeal and the factual or legal basis for such grounds must be expressly stated or the board shall deem such bases and grounds for appeal waived by the appellant." (*Id.*, § 2.88.050, subd. (A)(5).)

12

In accordance with these provisions, the Board of Supervisor's 109-page decision separately identified and addressed each "ground" SSE listed in its "Grounds of Appeal" set forth in its appeals packets; indeed, in many instances the Board extensively quoted from SSE's stated grounds to set forth the ground raised, which the Board then addressed. In fact, the Board's decision separately identified and addressed the grounds SSE raised in its first appeal from the Planning Commission's certification of the EIR, and those it raised in its second appeal from the Commission's approval of the project and permit. The Board addressed no other grounds.

Thus, like the appeal process at issue in *Tahoe Vista,* the County's procedures provided SSE "with an appeal from the Planning Commission's decision, but required [that SSE] to specify the particular subject or grounds of the appeal." (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 592.) And while the Board of Supervisors will "exercise its independent judgment in determining whether the decision appealed was correct" (Napa County Code, § 2.88.090, subd. (A)), an appeal is bounded by the grounds of appeal set forth in the appeal packet (*id.*, § 2.88.050(A)(4), (5)). (See *Tahoe Vista, supra,* 81 Cal.App.4th at pp. 592–593.)

Accordingly, to demonstrate that it exhausted its administrative remedies, SSE must show that it timely filed a notice of intent to appeal and timely submitted an appeal packet which specifically identified the grounds it raises in this court action.

Citing to *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865 (*Citizens*), SSE maintains *Tahoe Vista* is not controlling and it was not required to exhaust the administrative remedy set forth in the County's appeal ordinance. *Citizens* was decided by the same court that

13

decided *Tahoe Vista.*  The court did not repudiate its prior decision, but rather, distinguished it.

In *Citizens,* the city issued a notice of preparation of a draft EIR and the objecting group appeared at the planning commission meeting and asserted the draft was deficient in a number of respects.  (*Citizens, supra,* 144 Cal.App.4th at p. 869.)  A second objecting group raised similar, but not identical issues.  (*Ibid.*)  The commission subsequently certified the EIR and approved a permit and tentative map.  (*Id.* at p. 870.)  The city code provided for an appeal to the city council, which had to be filed within five days of the commission's decision.  (*Ibid.*)  There was no requirement that issues be specified; rather, the city gave notice that any person could appear and " 'present their views and comments' " on the development project.  (*Id.* at p. 871.)  The city further advised that any challenge in court, might be " 'limited to raising only those issues you or someone else raised' " at the city council hearing or in correspondence delivered to the city clerk before the council meeting.  (*Ibid.*)  Only the second objecting group filed an appeal from the commission to the city council.  But both groups appeared at the city council meeting, and the first objecting group raised the mitigation issue it subsequently raised in its writ proceeding.  (*Id.* at pp. 870–871.)  The trial court dismissed the writ petition for failure to exhaust administrative remedies on the ground the first objecting group had not filed its own appeal to the city council.  The Court of Appeal reversed.  (*Id.* at p. 872.)

Observing that the only issue before it was whether the first objecting group had exhausted its administrative remedies, the appellate court, as it had in *Tahoe Vista,* examined "the procedures applicable to the public agency in question." (*Citizens, supra,* 144 Cal.App.4th at p. 876.)  The court pointed out the city's appeal procedure differed from that at issue in *Tahoe Vista* in

14

several significant respects. The city did not require a specification of issues, nor did it require each objector to file its own appeal. On the contrary, the city council treated the second objectors' appeal as opening the entire environmental review process to anyone who wanted to voice any concern. (*Id.* at p. 877.) Indeed, the city essentially advised "that any person participating in the [council] hearing could subsequently challenge the matter in court limited only by the issues raised at the hearing." (*Ibid.*) Thus, rather than being a true " 'appeal,' " the city's procedures "in reality" simply "transfer[red] . . . the final decision-making authority from the planning commission to the city council."[7] (*Ibid.*)

---

[7] SSE points out the *Citizens* court first "note[s]" that if a nonelected body certifies an EIR, the public entity must, pursuant to section 21151, provide for an appeal to the elected decision making body, and under CEQA Guidelines, a final EIR must reflect the " 'lead agency's [i.e., the final decision making body's] independent judgment and analysis.' " (*Citizens, supra,* 144 Cal.App.5th at p. 876, italics omitted.) In *Citizens* then, the city council was the " 'final decision-making body' " that exercised the " 'lead agency's independent judgment and analysis.' " (Italics omitted.) Thus, the city council was not acting in a "traditional" appellate sense. (*Ibid.*) The court did not suggest, however, as SSE implies, that this was determinative of exhaustion. On the contrary, it was against this statutory backdrop, that the court went on to discuss the city's appeal procedures and to conclude they were, in significant respects, unlike those in *Tahoe Vista.* (*Id.* at pp. 876–877.) Indeed, in *Tahoe Vista,* the court had pointed out that while the board of supervisors heard issues on appeal de novo and was also required to adopt all findings necessary to implement approval of the project, including re-adopting a negative declaration, this did not mean the challengers did not have to follow the county's appellate procedures. (*Tahoe Vista, supra,* 81 Cal.App.4th at p. 593; see *Clews Land, supra,* 19 Cal.App.5th at pp. 187–188 [where environmental decision is delegated to nonelected body, which CEQA allows, agency must provide appeal process and challenger must comply with that process to pursue judicial challenge].)

15

Nor does *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325 (*Clean Energy*), assist SSE. In that case, the court concluded the city had improperly divided CEQA duties between the planning commission and the city council and, thus, the purported "delegation" to the commission was invalid. The action by the city council as the final decision maker, however, was valid. (*Id.* at pp. 1338, 1342.) As a consequence, there was no valid appeal to be taken from the decision by the commission under the municipal code "appeal" provisions. (*Id.* at pp. 1345–1346.) Nor did the code provide for any appeal from the city council's action. (*Id.* at p. 1346.) Moreover, in that venue, the objector had preserved issues for judicial challenge by submitting comment letters *before* the city council acted. (*Id.* at pp. 1346–1348.) The *Clean Energy* court not only did not take issue with *Tahoe Vista,* but it reaffirmed the exhaustion principles established by that case (*Clean Energy,* at pp. 1342–1344), concluding only that the circumstances in the case before it differed and the objectors complied with the dual requirements of section 21177 in the one forum that had validly acted, namely the city council. (*Clean Energy,* at p. 1348; *ibid.* ["The situation presented to us is dissimilar to the situation addressed in *Tahoe Vista,* where the ultimate decisionmaking authority's review was specifically confined to issues raised in the administrative process."])

Here, the County's appeal procedure is akin to that in *Tahoe Vista.* (See *Clews Land, supra,* 19 Cal.App.5th at pp. 185–187.) Accordingly, SSE was required to comply with that procedure.

We close with one final point as to exhaustion—that the petitioner challenging a CEQA determination "has the burden of proof to show exhaustion occurred." (*North Coast, supra,* 216 Cal.App.4th at p. 624; accord, *Sierra Club, supra,* 163 Cal.App.4th at p. 536.) And in this regard, a list of

16

string-cites to the administrative record without explanation as to "how each citation supports the assertion [the public agency] was 'fairly appri[s]ed' " of the asserted noncompliance with CEQA, is not sufficient. (See *Sierra Club,* at p. 536.)

With this overview of CEQA principles and the exhaustion requirement in mind, we turn to the five issues SSE raises on appeal.

### *Daily Particulate Emissions*

SSE maintains the EIR's emissions analysis is deficient because it assesses impacts on only an annualized basis and does not also include an assessment on a daily basis. SSE relies on comments by its expert, who opined the County's methodology of "[d]ividing the annual emissions across 365 days improperly dilutes the daily emissions because the Quarry only operates 250 days per year." [8]

The quarry is under the regulatory jurisdiction of the Bay Area Air Quality Management District (District), which is "a regional agency authorized to adopt and enforce regulations governing air pollutants from stationary sources such as factories, refineries, power plants, and gas stations in the San Francisco Bay Area. . . . (Health & Saf. Code, §§ 39002, 40000, 40001, subd. (a), 40200.) . . . [T]he District monitors air quality, issues permits to certain emitters of air pollution, and promulgates rules to control

---

[8] There is no exhaustion issue as to this issue. In what it identified as SSE's "Eighteenth Ground for Appeal" from the certification of the EIR , the Board of Supervisors addressed a claim that "annualized emissions were not properly analyzed" and, specifically, that it was not proper to determine "the total quantity of annual emissions" by "divid[ing] by 365 days/year to determine the average daily quantity of emissions released by the Quarry" because (a) the operational season was only 250 days and (b) "[d]aily emissions must be associated with daily production to arrive at an actual daily emissions exposure."

17

emissions. (*Id.*, §§ 40001, 42300, 42301.5, 42315.)" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 378, fn. omitted (*California Building*).)

To implement its charge, the District develops " 'thresholds of significance' for determining 'the significance of environmental effects.' " (*California Building*, *supra*, 62 Cal.4th at p. 378.) These thresholds set levels at which toxic air contaminants and certain types of particulate matter, including $PM_{2.5}$—particulate matter with a diameter of 2.5 microns or less— would be deemed environmentally significant. (*Id.* at p. 379.) The District's CEQA guidelines are "advisory" and provide methodologies "for analyzing air quality impacts based on evidence and technical studies supporting" the guidelines.

The Air Quality and Health Impact Risk Assessment (AQ Assessment) prepared by County consultants serves as the "evidentiary and analytical basis of the air quality sections of the EIR."[9]

The AQ Assessment explains that the air quality analysis utilizes "the impact assessment methodologies presented in the [District's] CEQA Air Quality Guidelines (BAAQMD 2010) and the [District's] Revised Draft Options and Justification Report CEQA Thresholds of Significance (BAAQMD 2009)." The AQ Assessment further explains "[o]perational emissions are evaluated using only the maximum annual thresholds because the average daily thresholds are equivalent (i.e. 10 tons divided by 365 days per year=54.8 lb/day which BAAQMD rounded down to 54 lb/day threshold)."

The EIR thus concludes that, "after mitigations," there is "less than significant" impact from PM 2.5 emissions based on use of a 365-day average annual threshold for that pollutant.

---

[9] The AQ Assessment is attached to the draft EIR as Appendix I.

18

Agencies have "substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 192.) "Similarly, our Supreme Court stated: 'A lead agency enjoys substantial discretion in its choice of methodology' for evaluation of the significance of an impact. (*Center for Biological Diversity* [*v. Department of Fish & Wildlife* (2015)] 62 Cal.4th [204,] 228 [(*Center for Biological Diversity*)].)" (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 884 (*King & Gardiner*).)

However, "when the agency chooses to rely completely on a single quantitative method to justify a no-significance finding, CEQA demands the agency research and document the quantitative parameters essential to that method. Otherwise, decision makers and the public are left with only an unsubstantiated assertion that the impacts . . . will not be significant. (See Guidelines, § 15064, subd. (f)(5) [substantial evidence to support a finding on significance includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts,' but not '[a]rgument, speculation, [or] unsubstantiated opinion'].)" (*Center for Biological Diversity, supra,* 62 Cal.4th at p. 228.)

With respect to SSE's assertion that the District's guidelines mandate an analysis of both annual *and* daily emissions, we first observe the District's guidelines are not legally binding directives to a lead agency conducting an environmental review under CEQA. (See Bay Area Air Quality Management District CEQA Guidelines, May 2011, p. 1-1 ["The purpose of the [District] . . . . Guidelines is to assist lead agencies in evaluating air quality impacts of projects and plans proposed in the San Francisco Bay Area Basin. . . . The Guidelines provides [District]-recommended procedures for evaluating

19

potential air quality impacts during the environmental review process consistent with CEQA requirements."]; *id.* at p. 2-5 ["A lead agency should rely on substantial evidence most appropriate for the project being studied."]; *id.* at pp. C-20-C-21 ["This is an advisory document that provides the lead agency, consultants, and project applicants with uniform procedure for addressing air quality in environmental documents."]; see also Robie et al., Cal. Civil Practice: Environmental Litigation (2020) § 8.4 ["The Guidelines set forth indications or outlines to be followed, allowing for flexibility in the action and conduct of governmental agencies. . . . The Guidelines are subject to a construction of reasonableness and courts will not seek to impose unreasonable extremes or inject themselves within an agency's area of discretion as to the choice of action to be taken."].)[10]

As pertinent here, the District's guidelines set forth a multi-step procedure for making a "[s]ignificance [d]etermination." Step 2 of this procedure involves "Comparison of Unmitigated Emissions with Thresholds of Significance," and is explained as follows: "Sum the estimated emissions

_____

[10] In its appellant's closing brief, SSE asserts the County "adopted" the District's guidelines as evidenced by "the EIR's explicit language that it 'utilize[d] the impact assessment methodologies' presented in the [District] Guidelines [citation] and the fact that Appendix G of the CEQA Guidelines states that a proposed project would have a significant impact if it violates an air quality standard." However, being guided by a District guideline is not tantamount to "adopting" the guideline as its own mandatory regulatory law. The draft EIR expressly states the District's guidelines are advisory. Moreover, the District's guidelines, themselves, contemplate adjustments as a particular situation warrants. (See District Guidelines, at p. 1-3 ["The recommendations in the CEQA Guidelines should be viewed as minimum considerations for analyzing air quality impacts. Lead agencies are encouraged to tailor the air quality impact analysis to meet the needs of the local community and may conduct refined analysis that utilize more sophisticated models, more precise input data, innovate mitigation measures, and/or other features."])

20

for area, mobile, and stationary sources (if any) for each pollutant as explained above and compare the total average daily and annual emissions of each criteria pollutant and their precursors with the thresholds of significance determined by the lead agency. If daily average or annual emissions of operational-related criteria air pollutants or precursors do not exceed the thresholds, the project would result in a less than significant impact to air quality. . . ."

SSE raised the annual/daily issue before the Planning Commission in comments on the draft EIR, and the issue was addressed in the response to comments attached to the final EIR.[11]

The response points out that "at the time that the [AQ Assessment] was prepared it was standard practice to use 365 days to determine the average daily emissions," and the AQ Assessment "used the CalEEMod model [California Emissions Estimator Model[12]] methods in place at the time." Therefore, the AQ Assessment was "prepared in a manner consistent with the default method for analyzing development project air quality impacts."

---

[11] The final EIR includes the draft EIR, comments and recommendations received on the draft; a list of persons, organizations and agencies commenting on the draft EIR, responses of the lead agency to significant environmental points, and any other information added by the agency. (Cal. Code Regs., tit. 14, § 15132; 14 Cal. Legal Forms: Transaction Guide (2020) § 30.B.210 Flowchart Describing Environmental Impact Evaluation Process.)

[12] The California Emissions Estimator Model "is a statewide land use emissions computer model designed to provide a uniform platform for government agencies, land use planners, and environmental professionals to quantify potential criteria pollutant and greenhouse gas . . . emissions associated with both construction and operations from a variety of land use projects." (CalEEMod, *California Emissions Estimator Model®*, <http://www.caleemod.com/> [as of March 25, 2021].)

21

The response additionally points out that the District was served with the Notice of Preparation of the draft EIR and a copy thereof, including all related technical studies—which discussed "how the Project emissions were evaluated in relation to their CEQA thresholds of significance." Had the District had concerns about the emissions analysis, it could have submitted comments on the draft. It did not, and thus "did not take issue" with the County's methodology.[13]

The response to comments further explains, "the [2009] baseline annual production level . . . and corresponding baseline emissions levels reported in the DEIR are the average over five years [2004-2008]. The Project daily average emissions, as calculated using annual emissions in the DEIR, would not be reflective of the daily average in the maximum year which would be the proper comparison to make. Thus, comparing the average day in the baseline period, the maximum calendar year production was 17% higher than the average production over the five years. If daily or monthly production data were available to calculate annual production on a rolling basis, then a greater annual production could be substantiated. Nevertheless, this increase in the baseline average day would decrease the Project average day by a corresponding amount." Accordingly, the response

---

[13] SSE's assertion in its appellant's closing brief that its "expert raised the omission of daily emissions analysis to the BAAQMD CEQA division planning manager, who expressed concern with the County's interpretation of the BAAQMD thresholds," thus, goes nowhere. Even assuming its expert told the Planning Commission prior to its certification of the EIR that in June 2015 he had called the District and his conversation "elicited concerns" by the planning manager, this assertion is hopelessly vague. Moreover, it does not detract from the fact the District was thereafter served with a copy of the draft EIR and technical attachments and voiced no criticism of the County's methodology as fully developed and set forth in the draft EIR and supporting attachments.

concluded, "using [an] annual emissions significance determination . . . as a surrogate for the average daily emissions significance determination is appropriate and reflective of the potential Project air quality impacts."

At the hearing before the Board of Supervisors, the County's consulting expert further discussed air quality particulates as follows: "The comment [critical of the particulate analysis] was, 'Well, on average, they are only going to work 350 [*sic*] days a year.' And so, obviously, if you divide it by 250 instead of 365, you get a higher number of pounds per day because there's fewer days in which to produce the ten tons. So the facility can operate 24/7, 365, but normal operation, like I said, is planned for 250 days per year. [¶] Using 365 days is appropriate, and here's why: The baseline annual production is averaged over five years and doesn't reflect the daily average. It reflects a multiple-year annual average, in fact. And so if we were to look at a daily average of what's actually daily going on, you would find that you had some very busy days, and you would find that you had less busy days." So, "from my perspective, we did include the daily threshold because it's the same as the annual threshold when you look at it the way we looked at it."

Following the close of the hearing, the Board of Supervisors found that, "As modeled for the [AQ Assessment] and described in the EIR, criteria air pollutant emissions (i.e., ROG, NOx, and exhaust $PM_{10}$ and $PM_{2.5}$) were average[d] over the year (i.e. 365 days), however, because the facility typically operates approximately 250 days/year which is the normal operating schedule (Draft EIR page 3-14), dividing by fewer operational days would increase the daily average emissions by 46% (i.e., $365 \div 250 = 1.46$) resulting in emissions of approximately 80 lb/day. The baseline annual production level (i.e. 810,363 tons/year) and baseline emissions levels identified in the Draft EIR are averaged over a five year period, therefore, comparing the

23

average day in the five year period with a 365 day maximum per year is a reasonable approach. (See response to comment in Final EIR, Appendix C, Air Quality and Greenhouse Gas Emissions for a full discussion on this issue.) [¶] When the [AQ Assessment] was prepared it was standard practice to use 365 days to determine the average daily emissions. The project [AQ Assessment] used the CalEEMod model methods in place at the time (i.e., Version 1.x). Furthermore[,] the average annual daily trips . . . used in CalEEMod are by definition the annual trips divided by 365. Thus, the air quality impact analysis was prepared in a manner consistent with the default method for analyzing project air quality impacts. [¶] The [District] provided comments on the [notice of preparation] in a letter dated July 30, 2009 and received the Draft EIR in 2013 including the related technical studies. [The District] did not identify any issues of project emissions evaluation in relation to CEQA thresholds of significance. [¶] Therefore, using annual emissions significance determination in the Draft EIR as a surrogate for the average daily emissions significance determination is appropriate and reflective of the potential project air quality impacts."

Thus, at bottom, SSE's issue as to the truck emissions analysis is that it is tied to the County's use of a five-year average annualized approach, rather than a one-year 250-day approach. This is a disagreement among experts, which is not a sufficient basis to conclude an EIR is inadequate. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 349 (*Atherton*) [" 'Disagreement among experts does not make an EIR inadequate. . . .' "].) " 'Although others might well assess the significance of [a] risk . . . differently, it [is] error for the court to substitute its judgment for that of the Agency.' " (*North Coast, supra,* 216 Cal.App.4th at p. 640.) "The issue is not whether other methods might have been used,

24

but whether the agency relied on evidence that a ' "reasonable mind might accept as sufficient to support the conclusion reached" ' in the EIR." (*Id.* at p. 642.) We cannot say that the five-year average annualized approach the County chose to use was bereft of explanation or not one a reasonable mind could accept.[14]

### *Baseline for Truck Traffic Emissions*

SSE also contends the EIR improperly assesses truck emission impacts by using a baseline production number based on a five-year average (2004-2008) annual production figure, rather than on 2009 production levels. Specifically, SSE asserts (1) the "EIR does not make the required showing that 2009 production levels would be misleading"; (2) the EIR does not address why use of a five-year average production figure was "required to provide the most accurate picture practically possible of [the] Project impacts"; and (3) does not address "why 2009 production levels were not included" in the five-year average production figure.

#### *Exhaustion*

The trial court ruled SSE failed to exhaust its administrative remedies with respect to these claims.

SSE claims it did exhaust its administrative remedies, pointing to the following language (which we have italicized) in its Grounds of Appeal in its appeal packet supporting its appeal of the certification of the EIR (we have quoted the entirety of the passages from which SSE has selectively quoted):

> "**A. Ad hoc changes to the EIR document have created a lot of confusion among staff, commissioners and the public regarding foundational elements of the Project including:**
> [¶] . . . [¶]

---

[14] Given our conclusion in this regard we need not, and do not, reach the County's and Syar's alternative arguments in defense of the truck emission analysis.

"6. *Interchangeable* use of '*total production*' and '*annual permitted saleable quantity*' throughout by County staff, consultants and staff obfuscate actual production for which EIR is performed. [¶] The terms 'total production' and 'annual permitted saleable quantity' are used interchangeably throughout the EIR and the EIR process even though these terms describe different production totals. As a result, the EIR underestimates the environmental impacts by approximately 50% because the amount of production required to produce annual permitted saleable quantities exceeds that amount by approximately 50%. Environmental impacts, including but not limited to air quality, hydrology and water quality, noise and vibration and greenhouse gases, determined by the amount of actual production is affected by this obfuscation such that those environmental impacts are as yet unknown." (Underscoring omitted, italics added.)

"C. *Baseline conditions are not adequately described.*

"The EIR fails to describe baseline conditions with reference to actually existing physical conditions. Instead, the EIR relies on models conducted at other sites to analyze the baseline air quality impacts. It used the standard trip from the County's traffic model to analyze baseline traffic conditions. It fails to disclose existing water usage, relying instead on data for water usage and groundwater levels to be collected after the expansion is approved. Air quality studies in the EIR are based on mining industry sponsored tests and models conducted at other sites and are calculated with controlled conditions not representative of the Project's actual conditions. The EIR provides no basis for relying on modeled conditions instead of measuring the actually existing physical conditions." (Italics added.)

"V. DEIR. Misrepresentation of Annual Product Sales.

"1. Throughout the Syar EIR and Lead Agency documents, annual quarry production is confused with annual quarry sales that in turn misleads and confused governmental decision makers and the public. [¶] 2. For instance, in the draft EIR Vol. 1, August 2013, Table 3-3, pg. 3-13, Product Sales (tons) are equated to existing total annual Quarry production. In the footnotes it is stated: [1] 810,364 Tons/Year Sold (total of Haul Trips and Rail Trips.) This *is the total processed not the total sold. This misleads governmental decision makers and the public.* Also, any permitting, production, or planning decisions are made using

26

this false basis will be also be inaccurate and false. [¶] 3.  Another example:  Draft EIR Vol. II, August 2013, 3.1.1, pg. 11: 'Between 2004 (period of record) the Quarry's annual average sales was approximately 810,000 tons, or 81 percent of the current permitted maximum.' " (Original italics omitted, italics added.)

SSE also points to the following language (which we again have italicized) in its Grounds of Appeal in its second appeals packet in support of its appeal of the project and permit approvals (and we have again quoted the entirety of the passages from which SSE has selectively quoted):

"XI.  The Findings for Approval of Surface Mining Permit fail to comply with the requirements of Napa county Code chapter 16.12 for issuance of surface mining permit, are in error, inadequate and incomplete.

"A.  Plans and reports submitted with the application do not adequately describe the proposed operation.  Inadequate and shifting description of project and its environmental impacts.  *Baseline production*, reserves, greenhouse gas emissions, truck trips, groundwater usage *are inaccurately and incompletely described.*  For example, the map attached as Exhibit 4 depicts an off-site groundwater well to which Syar has access but was never disclosed or analyzed.  Nor does the permit resolution require any monitoring or other condition related to this off-site well.  Exhibit 5, a page from the 1973 EIR conducted for the original permit shows groundwater at that time far exceeding that estimated today—1120.14 acre feet per year historically vs 140.6 acre feet per year.  There is no accurate estimate of groundwater use either in the EIR or in the permit approval such that the project's groundwater use may imperil surrounding properties' dependence on groundwater." (Italics added.)

None of these grounds of appeal comes close to apprising the Board of Supervisors of the five-year average/2009 actual production issue SSE has raised in this court action.[15]  Accordingly, as the trial court concluded, SSE

---

[15] SSE also points to pages in the record wherein its members or other persons sought information about and made comments pertaining to the "lack of support for the baseline production level."  None of this, however,

27

failed to exhaust its administrative remedies as to this issue and is barred from raising it in this court action.

### *Merits*

Even if SSE had exhausted its administrative remedies, its complaint about the production baseline used to assess truck emissions lacks merit.

"CEQA requires an EIR to 'focus on impacts to existing environment, not hypothetical situations.' [Citation.] '[T]he impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis. . . .' [Citation.] [¶] To accomplish this, CEQA directs an EIR to include what is called an environmental baseline, a description of the project site's physical and environmental conditions at the time the EIR is prepared. 'An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the preparation is published . . . from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.' (CEQA Guidelines, § 15125, subd. (a).) [¶] 'An inappropriate baseline may skew the environmental analysis flowing from it, resulting in

establishes that SSE *exhausted its administrative remedies* pursuant to the County appeals ordinance. As the ordinance specifies, and the Board of Supervisors' decision reflects, the only grounds considered and addressed on appeal by the Board are those identified in an appeal packet, and in neither of SSE's appeal packets did it identify as a ground for appeal the issue it has raised in this court action. Nor did the Board, in turn, address such ground in its decisions rejecting SSE's appeals. While SSE claims it did not have sufficient information to raise as a ground for appeal the five-year average/2009 actual production issue it is now pursuing, that is not so. It was clear the County was utilizing a five-year average methodology to assess impacts, and the legal challenge SSE is now making could have been advanced before the Board.

an EIR that fails to comply with CEQA.' [Citations.] The 'normal[]' rule is that the baseline must reflect the 'physical conditions existing at the time [the] environmental analysis' begins. [Citation.] [¶] However, ' "the date for establishing [the] baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods." [Citation.]' (*Communities, supra,* 48 Cal.4th at pp. 327-328; see also *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 218-219 . . . [(*Baykeeper*)] [five-year average of mining volumes was appropriate baseline].) Thus, 'despite the CEQA Guidelines' reference to '. . . the time environmental analysis is commenced' [citation], '[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." [Citation.]' (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*[*, supra,*] 57 Cal.4th 439, 449 . . . (*Neighbors for Smart Rail*).)" (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 614-615.)

Here, recognizing that "levels of operations vary . . . seasonally and with economic conditions," the County chose to use the "recent 5-year average annual rate" of production (2004 to 2008) instead of using only 2009 production data to calculate the production baseline. In short, in its AQ Assessment, the County both explained the methodology by which it established the production baseline, and provided a reasonable explanation for that choice. That SSE and its expert would use a different methodology is

29

not a basis for finding the EIR inadequate. (See *Atherton, supra,* 228 Cal.App.4th at p. 349; *North Coast, supra,* 216 Cal.App.4th at pp. 640, 642.)

Citing *Neighbors for Smart Rail, supra,* 57 Cal.4th 439, SSE asserts the County relied on a hypothetical and unsupported baseline without showing an existing conditions analysis would be misleading. SSE's reliance on *Neighbors* is misplaced. There, the lead agency used an exclusively "future conditions baseline for assessment of the project impacts on traffic and air quality." (*Id.* at p. 446.) "[W]hile an agency preparing an EIR does have discretion to omit an analysis of the project's significant impacts on existing environmental conditions and substitute a baseline consisting of environmental conditions *projected to exist in the future*," said the court, the agency also "must justify its decision by showing an existing conditions analysis would be misleading or without environmental value." (*Id.* at p. 457, italics added.)

Here, as we have discussed, the County did not use a future projected baseline analysis, rather it based the production baseline on production during the immediately preceding five years in order to account for variations in production caused by multiple factors.

What SSE is actually arguing is that *any* deviation "from CEQA's normal baseline"—i.e., existing conditions at the time of the notice of preparation is published—"must be supported by a demonstration in the EIR that analyzing project impacts under the normal baseline would be 'misleading or without informational value'" (*Association of Irritated Residents v. Kern County Bd. Of Supervisors* (2017) 17 Cal.App.5th 708, 730 (*Kern County*)) and that a reasoned explanation of how and why the agency has used historic data to determine the baseline is insufficient.

30

However, cases have rejected the assertion that the standard for a future conditions based baseline established in *Neighbors for Smart Rail* applies to every situation where a lead agency determines it is more reasonable to determine the baseline by considering data from a time period other than the date of publication of the notice of preparation. (See *Kern County, supra*, 17 Cal.App.5th at pp. 730-731 [determining test for future conditions baselines applies only "to baselines that use hypothetical future conditions" and not to "an agency's decision about how to measure existing conditions when the activity creating those conditions has fluctuated," italics omitted]; see also, e.g., *Baykeeper, supra*, 242 Cal.App.4th at pp. 218-219 [lead agency did not abuse its discretion in determining baseline for measuring project impacts by using a five-year average of annual mining volumes was a better indicator of existing conditions; the agency's determination was supported by "meaningful analysis"].)

*Baykeeper* is closely analogous to the case at hand. In that case, the Lands Commission granted real parties a 10-year extension of a 10-year mineral extraction lease authorizing them to continue dredging sand from certain lands. (*Baykeeper, supra*, 242 Cal.App.4th at pp. 210-211.) The Commission published the notice of preparation of the EIR in 2007. In the EIR, the lead agency explained that rather than using 2007 data to fix baseline conditions, it determined "a five-year average of annual mining volumes was a better indicator of existing mining conditions." (*Id.* at p. 216.) The EIR explained that "the volume of sand mined from the leased areas during 2007 was not an accurate reflection of existing baseline conditions because (1) limiting the baseline to any single calendar year would fail to account for the fact that the 'annual quantity of sand mined fluctuates substantially due to changes in demand, economic conditions, capacity, and

31

other facts,' and (2) the volume of sand that was mined in 2007 was in the 'low range compared with previous years.' " (*Id.* at p. 217.) These points were reinforced in the response to comments to the draft EIR, wherein staff acknowledged the notice of preparation date normally fixes the baseline, but explained that using the average volume of sand mined per year from 2002 to 2007 " 'recognizes that sand mining activity levels can fluctuate substantially from year to year. ' " (*Ibid.*) In the court action, the challenger contended the EIR was "deficient because the baseline conditions were artificially inflated and not reflective of current mining conditions in the projected area." (*Ibid.*)

The Court of Appeal upheld the commission's determination, concluding substantial evidence supported its utilization of "a five-year average of annual mining volumes was a better indicator of existing mining conditions than the 2007 rate in light of the financial crisis of 2007, and the general nature of the mining industry." (*Baykeeper, supra*, 242 Cal.App.4th at p. 218.) This evidence included data from the California Geological Survey which showed " 'California's residential construction slowdown during [2007] contributed to a significant decrease in both production and value of construction aggregate' " and statistics "regarding the permitted and actual sand mining volumes from the lease areas during the previous [ten year] lease period" which supported the commission's conclusions about the "fluid nature of mining activities in general." (*Ibid.*)

SSE maintains *Baykeeper* is distinguishable and the County failed to provide any "meaningful analysis . . . and supportive evidence" to support its use of a five-year average baseline. Specifically, SSE complains that unlike the Lands Commission in *Baykeeper*, the County did not "provide a 10-year average of production for comparison" nor the "annual statistics" for 2004 to 2008. Cases will, of course, differ, and there is no rule that only data

32

identical to that in *Baykeeper* can support a baseline based on historic data. Further, the County referenced the California Geological Survey (2013), which noted that many factors including population, "major public construction projects," and the economy can impact the demand for aggregate production.[16] The survey states, "Should unforeseen events occur, such as massive urban renewal, infrastructure projects, reconstruction in the wake of disaster, or major economic recession," the demand for aggregate could "change considerably." This fluctuation in demand can be seen in the provided data on the "recorded aggregate production" at the Syar quarry for the years 1960 through 2010. The data shows a varied course of production over this 50-year span, including during the baseline production years at issue here. The average production levels were 7,500,000 (2004), 7,943,000 (2005), 6,413,000 (2006), 6,778,000 (2007), and 4,753,000 (2008). (The average production for 2009 was 4,190,000 tons.)

The County and Syar maintain the production differential in 2009 reflects "a year of substantial economic downt[urn]." SSE maintains, in turn, that respondents "do not provide evidence for that statement or that the economic conditions impacted aggregate production levels in 2009." While we think it may be a matter of judicial notice that our state's economy was in serious distress during that time frame, the precise cause for the lower production level is immaterial. What the historic production numbers show is that aggregate production can vary considerably, supporting the County's

---

[16] Contrary to SSE's claim that the County referenced this document in the final EIR only "to demonstrate the Project site is classified as containing mineral deposits, not to support the claimed baseline conditions," the County actually referenced the document several times in its response to comments, including in response to a comment discussing the average truck trip distance, on-road emissions, aggregate consumption, and the production baseline of 810,363 tons per year.

determination that a five-year average is a reasonable means by which to assess the impacts of an expanded operation.

In sum, that SSE disagrees with the County's chosen methodology for determining the production baseline is insufficient to show an abuse of discretion. (See *Baykeeper, supra*, 242 Cal.App.4th at p. 219.)[17]

### *Insufficient Mitigation for Loss of Carbon Sequestration Capacity Due to Loss of Oak Woodlands*

SSE maintains the EIR also insufficiently addresses greenhouse gas emission impacts caused by the loss of oak woodland. Specifically, SSE claims Mitigation Measure 4.4-9 relies on "illusory oak tree preservation" (through conservation easements on existing woodlands) to mitigate the loss of carbon sequestration capacity provided by living trees, since the approved project would "deforest 121 acres of California oak woodland," but the mitigation measure requires that replacement trees be planted on only 12 acres.

#### *Exhaustion*

The County and Syar maintain SSE failed to exhaust its administrative remedies because it did not identify in either appeal packet the greenhouse gas/loss of oak woodlands issue it raises in this court action.

SSE first responds that the County and Syar forfeited exhaustion, as it was not raised as an affirmative defense in the trial court. As we have recited, however, the courts have repeatedly stated that exhaustion, particularly in CEQA cases, is a jurisdictional prerequisite and not a matter of judicial discretion. (E.g., *Clews, supra,* 19 Cal.App.5th at p. 184.) Furthermore, the exhaustion requirement is based on important public

---

[17] We need not, and do not, address the alternative arguments the County and Syar make to support the production baseline.

policies, including that the public agency has had a fair opportunity *during the environmental review process* to address and, if necessary, to correct, asserted deficiencies in its environmental review. (E.g., *North Coast, supra,* 216 Cal.App.4th at p. 623.) Failure to exhaust administrative remedies can also preclude the development of a full administrative record as to an issue subsequently challenged in a court action. This not only prejudices the public agency, but also impedes the court's ability to review the agency's action. Finally, whether an objector exhausted its administrative remedies is a legal question that can be as readily decided on appeal as in the trial court. (*Id.* at p. 624.)

We therefore need not automatically dispense with the exhaustion requirement solely because it was not raised in the trial court. (See *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 ["appellate courts have . . . permitted a party to raise belatedly 'a pure question of law which is presented on undisputed facts' "].) Given that nearly eight years of environmental review before the Planning Commission and the Board of Supervisors was devoted to the project at issue, resulting in an administrative record exceeding 29,000 pages in length, we decline to dispense with this jurisdictional prerequisite here.[18]

---

[18] SSE cites to *Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733 (*Golden Door III*), as though it holds exhaustion must first be raised in the trial court and if not, this prerequisite is forfeited. The case holds no such thing. *Golden Door III* involved an original writ proceeding challenging an order on a motion to augment the administrative record. (*Id.* at p. 50.) Specifically, the appellate court addressed whether a lead agency must retain documents, including e-mails, regardless of any automatic document destruction protocols. The court answered in the affirmative. (*Id.* at pp. 42-43.) It's only mention of exhaustion was in explaining why the discovery referee had erred in refusing to consider the showing the petitioner made in its reply memorandum, responding to an exhaustion argument the respondent made in its opposing discovery

SSE secondly responds that it did exhaust its administrative remedies as to the greenhouse gas/loss of oak woodlands issue it has raised in this court action.

We have reviewed the entirety of SSE's grounds of appeal in both appeal packets. While there are a number of generic assertions of inadequate analysis of greenhouse gases, *nowhere* in SSE's grounds of appeal pertaining to greenhouse gases is there *any* reference to trees at all, let alone an assertion the greenhouse gas analysis is deficient due to failure to adequately account for and mitigate loss of carbon sequestration capacity.

For example, on the pages of its appeals packets to which SSE cites, we find the following language, which we presume is the language to which SSE must be referring, since each page has extensive, single-spaced text and SSE provides no further assistance as to what language it believes is relevant to exhaustion:

> "The EIR's greenhouse gas emissions calculations and the air quality assessment are calculated on the basis of the number of truck and vehicle trips associated with the quarry operation. However, the EIR does not identify the length of the truck or vehicle trips. This information is essential for determination of the emissions associated with each and cumulative trips. A California Public Records Act request was made for the weigh tags, which identify the actual destination of each truck trip, thereby allowing calculation of the emissions associated with it. The County refused to provide the weigh tags and acknowledged that it does not have the information requested. After the lengthy EIR process, the administrative record still does not contain evidence of the amount of aggregate used locally or the future local need for aggregate or the reserves present in the unexpanded quarry. Failure to evaluate the emissions associated with the actual

_____

memorandum. The appellate court stated the petitioner had no obligation in its discovery moving papers to anticipate the respondent's exhaustion argument and properly countered the argument in its reply. (*Id.* at pp. 63-64.)

36

trips renders the EIR's greenhouse gas emissions calculations and air quality assessment invalid. The Planning Commission's conclusion that the environmental impacts of the project on greenhouse gas emissions and air quality are 'less than significant' is not supported by substantial evidence."

"The EIR finds the proposed expansion would have significant air quality and greenhouse gas emission impacts yet fails to require feasible mitigation that would eliminate or substantially lessen these impacts. The EIR does not include a greenhouse gas mitigation plan. Quantification of Syar's greenhouse gas emissions data is unverified. The EIR does not identify or analyze the cumulative environmental impacts of the Project's contribution to greenhouse gases. . . . [T]he EIR was certified without an accurate inventory of existing emissions so the impact of the Project's current operations or proposed expansion cannot be comprehensively analyzed."

"Mitigation measures are inadequate to address environmental effects of project." "[G]reenhouse gas emissions . . . are inaccurately, inadequately and incompletely described."

Rather, the only mention of trees in SSE's stated grounds of appeal in either appeal packet is in section XVI of its grounds of appeal of the project and permit approvals, wherein SSE stated in pertinent part:

"XVI. The Conditions of Approval (COA) are flawed because they are based on flawed/inadequate mitigation measures. In addition, the following are examples of other issues with the COA. Again, due to the time allowed to file the appeal, an exhaustive list of flaws in the COA cannot be provided at this time. [¶] . . . [¶]

"7. COA—PROJECT SPECIFICATION CONDITIONS, ITEM N: requires replacement of oak woodlands at a ratio of 2:1, but a tree count was not included in the EIR or in the Conditions of Approval from which the number of replacement trees can be determined.

"8. COA—PROJECT SPECIFICATION CONDITIONS, ITEM O: does not address inadvertent removal of trees."

Again, this ground did not begin to fairly apprise the Board of Supervisors of the greenhouse gas/loss of oak woodlands carbon sequestration issue SSE has raised in this action.  The Board, in turn, understandably, did not perceive SSE to be raising any such issue by virtue of this stated ground, as evidenced by its decision rejecting SSE's appeals and specifically addressing this ground as follows:

> **"Appellant's Position:**
> Appellant SSE alleges that the conditions of approval are flawed because they are based on flawed/inadequate mitigation measures. Appellant SSE includes the following examples of other issues with the COA and contends that due to the time allowed to file the appeal, an exhaustive list cannot be provided in time.  [¶] . . . [¶]
>
> "7. COA—PROJECT SPECIFICATION CONDITIONS, ITEM N: requires replacement of oak woodlands at a ratio of 2:1, but a tree count was not included in the EIR or in the Conditions of Approval from which the number of replacement trees can be determined.
>
> "8. COA—PROJECT SPECIFICATION CONDITIONS, ITEM O: does not address inadvertent removal of trees. [¶] . . . [¶]
>
> **"Findings and Decision.**  [¶] . . . [¶]
>
> "The Conditions of Approval are detailed, voluminous, enforceable, and subject to review every five years at a noticed public hearing before the Planning Commission.  (See COA No. 1(F).)  This review is in addition to the Annual Compliance and Assurance Update Report submitted to the Planning, Building and environmental Services Department per COA NO. 2(L). [¶] . . . [¶]
>
> "Regarding COA Nos. N and O, the project replaces oak woodlands at this scale on an acreage basis, not on an individual tree basis. Mitigation includes the appropriate acreage of replacement oak woodland to satisfy the 2:1 replacement ratio."

38

SSE additionally cites to two other pages of the record—which are not part of its stated grounds of appeal but are attachments to its second appeal packet. However, as the County's appeal ordinance makes explicit, and the Board of Supervisor's decision makes clear, *only* specified grounds are addressed on appeal. For the same reason, SSE cannot rely on written comments submitted to the planning department by the Quercus Group three months after SSE filed its second appeal packet identifying its "Grounds of Appeal" of the project and permit approvals. These comments discussed "direct and indirect biogenic GHG emissions [that] occur when native forest resources are harvested" and referenced "Mitigation Measure 4.4-9."[19] ( SSE has not directed our attention, however, to any action by it to augment its stated grounds of appeal either as to the certification of the EIR or approvals of the project and permit. Accordingly, as we have recited, the Board of Supervisors, in accordance with the County's appeal ordinance, addressed and made findings only as to the stated grounds before it.

In short, SSE did not raise as a Ground of Appeal to the Board of Supervisors the greenhouse gas/loss of oak woodlands issue it raises in this court action. Thus, SSE did not exhaust its administrative remedies as to this issue.

### Merits

Indeed, as to this issue, SSE's failure to exhaust its administrative remedies—and thus its failure to afford the County the opportunity to

---

[19] During one of the hearings before the Board, an individual, not from SSE, but an organization called Bay Area 350, spoke about biogenic greenhouse gases, Mitigation Measure 4.4-9, and also read parts of the Quercus Group report into the record.

address this ground during the environmental review process—creates an impediment to full judicial review.

As we have recited, the Board had no cause to understand SSE was attacking either the certification of the EIR or the approvals of the project and permit on the ground the greenhouse gas analysis was deficient due to failure to sufficiently mitigate loss of carbon sequestration capacity provided by existing oak trees, and the Board therefore did not address this issue.

Rather, the Board addressed the only ground pertaining to trees SSE identified—that the conditions of approval of the project and permit were "flawed" because condition N requiring tree replacement at a 2:1 ratio did not include a "tree count" and condition O did not address the "inadvertent removal of trees." And as to *that* ground, there is no dispute that the Board provided a reasonable explanation as to why it rejected SSE's assertions as to conditions N and O.

The EIR explains that Mitigation Measure 4.4-9 specifies that "[d]irect and indirect impacts **to** approximately 130 acres of native oak woodlands shall be compensated at a total mitigation ratio of 2:1, including [a] combination of onsite avoidance and preservation . . . , onsite replacement . . . and offsite." (Boldface and italics added.) More specifically, "mitigation may be accomplished through a combination of onsite avoidance/preservation, partial onsite replacement/preservation, and additional preservation in accordance with a plan prepared by a qualified biologist. The additional preservation will be achieved through onsite or offsite mitigation, in-lieu fee payment to the Oak Woodlands Conservation Fund or through other mitigation activities. . . ."

As to tree replacement, the EIR states "[a] site evaluation of oak woodlands on the project site by an ecologist mapped out areas that appeared

40

suitable for initiating oak replacement plantings. . . . These areas amount to approximately 12 acres of suitable area for potential onsite replacement for partial mitigation of impacts to oaks. . . ."

The EIR goes on to state that, under the mitigation measure, "[t]he proposed project would avoid [any future disturbance of] 136 acres of on-site oak woodlands. . . . These areas shall be protected via deed restriction in a form acceptable to the County and shall be recorded prior to any new vegetation removal activities." A further provision of the mitigation measure provides that "[a]n additional 111 acres off-site shall be permanently preserved via easement or deed restriction or in-lieu fee payment to the Oak Woodlands Conservation Fund consistent with Public Resources Code section 21083.4. . . . Offsite location(s) shall be located within Napa County and be of like quality and habitat value as those being removed. . . ."

The combination of mitigation measures required by Mitigation Measure 4.4-9 is consistent with the Oak Woodlands Preservation Act (§ 21083.4), which provides in part: "As part of the determination made pursuant to Section 21080.1,[20] a county shall determine whether a project within its jurisdiction may result in a conversion of oak woodlands that will have a significant effect on the environment. If a county determines that there may be a significant effect to oak woodlands, the county shall require one or more of the following oak woodlands mitigation alternatives to mitigate the significant effect of the conversion of oak woodlands: [¶] (1) Conserve oak woodlands, through the use of conservation easements. [¶] (2)(A) Plant an appropriate number of trees, including maintaining plantings

_____

[20] Section 21080.1 provides in part: "The lead agency shall be responsible for determining whether an environmental impact report, a negative declaration, or a mitigated negative declaration shall be required for any project which is subject to this division." (§ 21080.1, subd. (a).)

41

and replacing dead or diseased trees. [¶] (B) The requirement to maintain trees pursuant to this paragraph terminates seven years after the trees are planted. [¶] (C) Mitigation pursuant to this paragraph shall not fulfill more than one-half of the mitigation requirement for the project. [¶] (D) The requirements imposed pursuant to this paragraph also may be used to restore former oak woodlands. [¶] (3) Contribute funds to the Oak Woodlands Conservation Fund, as established under subdivision (a) of Section 1363 of the Fish and Game Code, for the purpose of purchasing oak woodlands conservation easements, as specified under paragraph (1) of subdivision (d) of that section and the guidelines and criteria of the Wildlife Conservation Board.  A project applicant that contributes funds under this paragraph shall not receive a grant from the Oak Woodlands Conservation Fund as part of the mitigation for the project. [¶] (4) Other mitigation measures developed by the county."  (§ 21083.4, subd. (b)(1)-(4).)

The combination of mitigation measures required by Mitigation Measure 4.4-9 is also consistent with the oak woodlands provisions of the County's general plan.  It provides, as to oak woodland habitat, that the County shall "[m]aintain and improve oak woodland habitat to provide for slope stabilization, soil protection, species diversity, and wildlife habitat through appropriate measures including" compliance with section 21083.4 and providing "replacement of lost oak woodlands or preservation of like habitat at a 2:1 ratio when retention of existing vegetation is found to be infeasible."

In sum, through the combination of mitigation measures required by Mitigation Measure 4.4-9, the impact *on* 121 acres of oak woodlands is being mitigated by way of planting and preserving a collective total of 242 acres of such woodlands, and the EIR, thus, concludes the mitigation measure "would

42

reduce the potential impacts *on* coast live oak and habitat to a less-than-significant level by implementation of avoidance, restoration and/or replacement." (Boldface & italics added.)

However, SSE is not, at this juncture, complaining about the sufficiency of the mitigation measures to address the impact *on* the native oak woodlands, but rather about its sufficiency to mitigate greenhouse affects and, specifically, loss of carbon sequestration capacity.

The EIR separately analyzes greenhouse gas emissions, including changes to carbon sequestration capacity resulting from the clearing of the trees. Specifically, section 4.17 of the EIR, entitled "Greenhouse Gases," explains "[w]hen land is cleared, some percentage of the carbon stored is released back to the atmosphere as $CO_2$. Land clearing or the loss of carbon stock is thus a type of [greenhouse gas] emission." The EIR concludes the proposed project "would have a potentially negative effect on the County's current level of carbon sequestration functions. . . . This impact is considered potentially significant."

The EIR then discusses the mitigation measure "requir[ing] compensation for loss of oak woodland" (i.e., Mitigation Measure 4.4-9[21]), and also Mitigation Measure 4.17-2. It explains that "Mitigation Measure 4.4-[9] would require compensation for loss of oak woodland. Compensation would include a mix of preservation (either on or off-site), onsite replacement, and contribution to an in-lieu fee program. . . . Mitigation Measure 4.17-2 would monitor [greenhouse gas] emissions as the project is implemented and identify measurable reduction strategies to reduce emissions when emissions

_____

[21] The EIR refers to the mitigation measure regarding compensation for loss of oak woodland as 4.4-8, but this appears to be a typographical error as 4.4-8 addresses impacts to purple needlegrass, whereas 4.4-9 addresses loss of oak woodland.

exceed the established baseline. . . . As mitigated, the proposed project would be consistent with the Napa County General Plan, and [the impact] would be considered less than significant."

SSE complains that the " 'EIR hasn't provided any mathematical calculations that demonstrate the proposed mitigation will in fact reduce direct and indirect biogenic emissions to less than significant' " and that the EIR fails to demonstrate how Mitigation Measure 4.4-9 "would 'actually mitigate the [121] acres of lost forest carbon sequestration capacity.' "

But because SSE did not identify these complaints as a Ground of Appeal, they were never addressed during the administrative proceedings.

We are therefore left to observe that SSE cites no authority requiring mathematical calculations concerning carbon sequestration mitigation. In fact, the Bay Area Air Quality Management District's CEQA Air Quality Guidelines specifically provide: "Biogenic CO2 emissions should not be included in the quantification of [greenhouse gas] emissions for a project. In its reply brief, SSE asserts, as we understand it, that it is not claiming "biogenic" greenhouse gases must be included in the "quantification" of total green gas emissions, but rather, that the effectiveness of mitigation measures for loss of carbon sequestration capacity must be demonstrated by mathematical computation. SSE does not, however, cite to any District guideline that imposes such a requirement.

SSE also cites to *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 (*King*), as compelling the conclusion Mitigation Measure 4.4-9's authorization of conservation easements on other woodlands is, per se, inadequate mitigation of loss of carbon sequestration capacity. In *King*, the project at issue was a Kern County "ordinance to streamline the permitting process for new oil and gas wells" for which an EIR had been prepared. (*Id.*

44

at p. 829.) "An important purpose of the proposed amendment was to eliminate time-consuming and costly review of individual well and field development activities by establishing a ministerial permit review process that incorporates mitigation measures identified in the project's EIR. If the County correctly determined the permit review process was ministerial—that is, did not involve the exercise of discretion—the processing of future permit applications by the County [would] not be subject to additional environmental review under CEQA." (*Id.* at p. 832, fn. omitted.)

One of the issues addressed by the EIR was conversion of agricultural lands in Kern County. The EIR "estimated annual land disturbances associated with future oil and gas exploration and production activities would result in the conversion of 298 acres of agricultural land annually." (*King*, *supra*, 45 Cal.App.5th at p. 870.) A mitigation measure required loss of agricultural land to be addressed in a " '1:1 mitigation ratio' " via four different methods, one of which was funding agricultural conservation easements. (*Id*. at p. 871.) The court concluded "agricultural conservation easements . . . do not actually offset the conversion of farmland." (*Id*. at pp. 829-830.) It explained "Entering into a binding agricultural conservation easement does not create new agricultural land to replace the agricultural land being converted to other uses. Instead, an agricultural conservation easement merely prevents the future conversion of the agricultural land subject to the easement. Because the easement does not offset the loss of agricultural land (in whole or in part), the easement does not reduce a project's impact on agricultural land. The absence of any offset means a project's significant impact on agricultural land would remain significant after the implementation of the agricultural conservation element. . . . At the end of each year, there would be 289 fewer acres of agricultural land in Kern

45

County.  Accordingly, under the thresholds of significance listed in the EIR, this yearly impact would qualify as a significant environmental effect. Therefore, we agree with KG Farms' contention that MM 4.2-1.a does not provide effective mitigation for the conversion of agricultural land."  (*Id.* at pp. 875-876.)

Here, SSE is not challenging the adequacy of Mitigation Measure 4.4-9 to mitigate the impact ***on*** (and namely, the loss of) oak woodlands, which would be the analog of the loss of farmland in *King*.  Rather, SSE has expressly limited its claim to "the failure of the EIR to formulate effective mitigation for the Project's GHG impacts due to carbon sequestration and storage losses."

SSE's reliance on *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467 (*Golden Door II*) is also misplaced.  That case concerned the county's ongoing efforts to adopt a climate action plan, guidelines for determining significance of climate change, and a supporting EIR.  (*Id.* at p. 482.)  At the outset of its opinion, the court stated:  "To be abundantly clear, our holdings are necessarily limited to the facts of this case, and in particular [mitigation measure] M-GHG-1.  Our decision is not intended to be, and should not be construed as, [a] blanket prohibition on using carbon offsets—even those originating outside of California—to mitigate GHG emissions under CEQA."  (*Id.* at p. 483.)  In concluding that M-GHG-1 violated CEQA because its performance standard was unenforceable, the court rejected the County's assertion M-GHG-1 was the "equivalent" of a "cap-and-trade offset[]" program.  The court explained M-GHG-1 was "materially different from Assembly Bill No. 32 compliant cap-and-trade offsets."  (*Id.* at p. 511.)  For one thing, M-GHG-1 did not require offset protocols "to be consistent with CARB requirements under title 17, section

46

95972, subdivision (a)(1)-(9) of the California Code of Regulations." (*Id.* at p. 512.) There also were no limits of use of credits, from any place in the world, to meet greenhouse gas reduction standards. "In sharp contrast, cap-and-trade offsets cannot[, under the state's regulatory scheme,] exceed *8 percent* of an entity's entire compliance obligation." (*Id.* at p. 513.) In addition, under the state's cap-and-trade scheme, "GHG emission reductions must be *additional* 'to any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur.' " (*Id.* at pp. 513-514.) "For example, CARB will not approve a protocol that 'includes technology or GHG abatement practices that are already widely used.' " (*Id.* at p. 514.)

Suffice it to say, the court's discussion in *Golden Door II* of a greenhouse mitigation measure enacted in conjunction with the development of the county's climate action plan, and specifically in the context of rejecting the county's assertion the measure was the equivalent of a statutorily compliant cap-and-trade program, is not the context with which we are concerned here. Furthermore, SSE's reliance on the cap-and-trade discussion in *Golden Door II* to bolster its claim that the EIR in this case insufficiently mitigates greenhouse gas impacts caused by loss of oak woodlands only magnifies the consequences of its failure to exhaust its administrative remedies as to this issue—the County had no opportunity to address any comparative cap-and-trade issue, and the record, in turn, is not developed in this respect.

Finally, the EIR identifies not only Mitigation Measure 4.4-9, but also Mitigation Measure 4.17-2. This mitigation measure provides in pertinent part:

> "The Applicant shall prepare a Greenhouse Gas Reduction Plan (GHG
> Reduction Plan). The GHG Reduction Plan shall identify the measures

47

to be used to reduce the GHG emissions associated with the proposed project below the 1,100 MT $CO_2$e annual land use threshold (or increase of 1,100 MT $CO_2$e over baseline conditions). The effectiveness of each measure in the GHG Reduction Plan shall be quantified, indicating its contribution to the reduction of GHG emissions. The Applicant shall choose from, but not be limited to, the following measures to incorporate into the GHG Reduction Plan: [¶] Fuel on-road and off-road vehicles with alternative fuels (such as hybrid, biodiesel, and electric); [¶] Plant native trees and vegetation that have low emissions of volatile organic compounds species for carbon sequestration in locations at the project site not to be disturbed by quarrying activities; [¶] Replace diesel-powered vehicles with newer model, low-emission vehicles or replace diesel engines with higher fuel efficiency engines or use retrofit emission control devices, such as diesel oxidation catalyst, verified by the California Air Resources Board as old vehicles or engines no longer become operable; [¶] Develop a monitoring program that reduces diesel-fueled idling times beyond that required under the California Air Resources Board Heavy-Duty Vehicle Idling Emission Reduction Program; [¶] Require that on-road haul trucks that are under contract with the quarry operator use 2003 model or newer trucks; [¶] Establish an on-site renewable energy system (such as solar); [¶] Install an automated load out system; [¶] Contribute to a State or County offset mitigation program. [¶] The GHG Reduction Plan shall be reviewed and approved by Napa County and shall be updated as necessary to address changing conditions and regulations. [¶] Prior to implementing the GHG Reduction Plan, the Applicant shall monitor GHG emissions biannually in a GHG inventory submitted to the County for review. The first inventory shall be calculated as a three-year average after issuance of the use permit (for example, if the use permit is issued in 2014, then the first inventory shall be performed in 2018 for years 2015 through 2017). A three-year average would accommodate the variability in aggregate sales from year to year. The inventory shall follow the most recent version of the General Reporting Protocol of the California Climate Action Registry or other protocol as appropriate and approved by the County (CCAR 2007). . . . The purpose of the inventory is to compare emissions from project operations to the baseline emissions established in this EIR, which is approximately 7,200 MT $CO_2$e per year (if new baseline emissions are established as a result of refined reporting methods, the use of a different baseline is acceptable with approval by the County). At such time as the inventory indicates GHG emissions are at or over baseline

48

conditions (7,200 MT $CO_2$e per year), then the Applicant shall implement measures in the GHG Reduction Plan as necessary to avoid emissions above the 1,100 metric ton threshold (i.e.: 8,300 MT $CO_2$e per year–baseline plus threshold)."

The Board of Supervisors addressed and rejected SSE's complaints that the "EIR does not include a greenhouse gas mitigation plan," "[q]uantification of Syar's greenhouse gas emissions is unverified," and the "EIR's air quality mitigation measure (Mitigation Measure 4.3) consists essentially of keeping logs and providing the logs to the County twice a year if the County asks for it." (Italics & underscoring omitted.) The Board pointed out that "the Final Draft Climate Action Plan was publicly available and referenced in Section 4.17 of the Draft EIR. . . . [¶] . . . The [Greenhouse Gas Reduction Plan] will incorporate one or more of the measures listed in Mitigation Measure 4.17-2, which would reduce GHG impact to less than significant levels. . . . [¶] . . . Mitigation Measure 4.17-2 will monitor and begin mitigating emissions as they approach or exceed the threshold. The project will mitigate any emissions over the threshold, even if the emissions had already occurred and the project implements mitigation retroactively. . . . [¶] . . . The mitigation measures contain performance standards and provides a range of options for demonstrating compliance. Syar has not asserted that it is infeasible and has agreed to comply."

In sum, as to the greenhouse gas issues SSE actually raised in its appeal to the Board of Supervisors, there is ample discussion in the EIR and appropriate mitigation measures have been required.

### Water Usage Baseline

SSE maintains the water use baseline is "unsupported" and "relies on layers of uncertainty," thereby resulting in an "artificially high baseline" which has resulted in "underreport[ing] the Project's potential impacts." As

49

we understand its claims, SSE contends the baseline is inaccurate for two reasons. One, "there are conflicting amounts" stated "throughout the EIR" as to annual sand production during 2004-2008 (these five years of production were averaged to provide the production baseline figure) and the EIR "relies on the highest estimate." Two, the baseline determination incorrectly "assume[d] that the sand production water use" during 2009-2011 which was determined to be 2.7 percent of the total water usage during those years, was also 2.7 percent of the total water usage during the preceding five years. These asserted shortcomings resulted, with no "factual support," in a "significant scale-up of the water usage for dust control."

### *Exhaustion*

Syar and the County maintain SSE failed to exhaust its administrative remedies in regard to the complaints about the water usage baseline they have pursued in this court action. They assert SSE's appeal packets raised only "the general and nebulous issue that the EIR contains an '[i]naccurate description of current groundwater use.'"

SSE maintains it exhausted its administrative remedies, citing to the following language (which we have italicized) in its grounds of appeal in its first appeal packet, in support of its appeal of the EIR certification (we again set forth the entirety of the passages in which the language cited by SSE appears):

> **"C. Baseline conditions are not adequately described.**
>
> "The EIR fails to describe baseline conditions with reference to actually existing physical conditions. Instead, the EIR relies on models conducted at other sites to analyze the baseline air quality impacts. It used the standard trip length from the County's traffic model to analyze baseline traffic conditions. *It fails to disclose existing water usage, relying instead on data for water usage and groundwater levels to be collected after the expansion is approved.* Air quality studies in

50

the EIR are based on mining industry sponsored tests and models conducted at other sites and calculated with controlled conditions not representative of the Project's actual conditions. The EIR provides no basis for relying on modeled conditions instead of measuring the actually existing physical conditions." (Italics added.)

**"M. Mitigation deferred and/or inadequate**.

"1. 35-year permit period precludes adequate mitigation measures.

"The County admits that 'pre-design of the mine at each stage of development is difficult and prone to inaccuracies because the economics and technology available for material recovery cannot be accurately evaluated based on what is known today. Mining operations are inherently market sensitive and market value and need for specific types of material vary greatly over time.' The County further admits that '(u)ntil the economic value and market demand for material is known with precision the cost/benefit of mining and implementing all of the mitigation measures cannot be evaluated.' [Citation.]

"Even assuming that the impact analysis is correctly done, which it clearly was not, mitigation is inadequate. The document relies on infeasible mitigation measures in several major resource areas which are insufficient to reduce potential impacts to a less than significant level for other impacts and other resource areas. Some examples include:

> *"a. Groundwater*
> *Assessment of existing water usage and groundwater levels will not occur until after Project approval.* This constitutes impermissible deferred mitigation.
>
> "Given the fractured bedrock nature of the aquifer, the mitigation measure meant to prevent excess loss of groundwater through seepage (Mitigation Measure 4.8-2) is infeasible. The mitigation measure relies on borings to determine whether mining may be planned close to the groundwater table; in fractured bedrock, where groundwater flow occurs primarily through fractures, borings will not be able to correctly predict the location of the groundwater table. The County's experience with the MST amply demonstrates that groundwater elevations, groundwater

51

quality, and groundwater flowrates can vary tremendously between wells located in close proximity.

"The mitigation measure (Mitigation Measure 4.8-3) intended to ensure that groundwater consumption does not exceed the currently stated level of 140 acre feet per annum (afa) is inadequate because it fails to account for new consumptive uses associated with increased loss to evaporation from new/larger ponds, and the greatly increased surface area of the rock face. No effort was made to assess the potential extent of seepage (although Syar should have been able to provide some characterization of current seepage levels.) See Parker Groundwater Report in the administrative record."[22]

SSE's also cites to the following language (which we have italicized) in its "Grounds of Appeal" in its second appeal packet in support of its appeal of the project and permit approvals (we again set forth the entirety of the passage in which the language cited by SSE appears):

"XI. The findings for Approval of Surface Mining Permit fail to comply with the requirements of Napa County Code Chapter 16.12 for issuance of surface mining permit, are in error, inadequate and incomplete.

"A. Plans and reports submitted with the application do not adequately describe the proposed operation. Inadequate and shifting description of project and its environmental impacts. Baseline production, reserves, greenhouse gas emissions, truck trips, *groundwater usage are inaccurately, inadequately and incompletely described*. For example, the map attached as Exhibit 4 depicts an off-site groundwater well to which Syar has access but was never disclosed or analyzed. Nor does the permit resolution require any monitoring or other condition related to this off-site well. Exhibit 5, a page from the 1973 EIR conducted for the original permit shows groundwater at that time far exceeding that estimated today-1120.14 acre feet per year historically vs. 140.6 acre

---

[22] The Parker Groundwater Report was attached to a June 2, 2015 letter to the Planning Department from Kathy Felch, "on behalf of" Syar. Contrary to SSE's claim, the appeal packet did not "incorporate" this report by this reference, nor did the packet identify where, in the massive administrative record, the report was to be found.

feet per year. *There is no accurate estimate of groundwater use either in the EIR or in the permit approval* such that the project's groundwater use may imperil surrounding properties' dependence on groundwater." (Italics added.)

The excerpts on which SSE relies, particularly when read in context, can only be described as " '[r]elatively . . . bland and general references to environmental matters,' " " 'unelaborated comment[s].' " (*North Coast Rivers, supra,* 216 Cal.App.4th at p. 623.) Such generic objections do not satisfy the exhaustion requirement. (*Ibid.*)

Moreover, SSE's statements certainly did not apprise the Board of Supervisors of the sand production related issues SSE has pursued in this court action, as the Board's decision reflects.

The Board summarized SSE's "baseline" ground of appeal as follows:

"Baseline conditions are not adequately described. The EIR fails to describe baseline conditions with reference to actually existing physical conditions. Instead, the EIR relies on models conducted at other sites to analyze the baseline air quality impacts. It used the standard trip length from the County's traffic model to analyze baseline traffic conditions. It fails to disclose existing water usage, relying instead on data for water usage and groundwater levels to be collected after the expansion is approved. Air quality studies in the EIR are based on mining industry sponsored tests and models conducted at other sites and are calculated with controlled conditions not representative of the Project's actual conditions. The EIR provides no basis for relying on modeled conditions instead of measuring the actually existing physical conditions."

As to this ground, the Board concluded in relevant part:

"Substantial evidence supports the EIR's determination of baseline conditions for groundwater. There is no historical metering of groundwater use at Syar Napa Quarry because groundwater use metering has not been a County requirement of pre-existing groundwater wells in the MST. The lack of groundwater extraction data is not unique in Napa County or the State of California. Due to

53

the unavailability of groundwater metering data in 2009 (when the County published the NOP), metering was conducted as part of the baseline studies for the project during 2011. The EIR used this data to calculate the groundwater used during the baseline year of 2009 by adjusting for differing production volumes between 2009 and 2011, as recorded in the Syar Napa Quarry Water Supply Assessment found in the Draft EIR, Appendix K."

The Board summarized SSE's mitigation deferred/inadequate ground of appeal in pertinent part as follows:

"35-year permit period precludes adequate mitigation measures. [¶] The County admits that 'pre-design of the mine at each stage of development is difficult and prone to inaccuracies because the economics and technology available for material recovery cannot be accurately evaluated based on what is known today. Mining operations are inherently market sensitive and market value and need for specific types of material vary greatly over time.' The County further admits that '(u)ntil the economic value and market demand for material is known with precision the cost/benefit of mining and implementing all of the mitigation measures cannot be evaluated. [¶] Even assuming that the impact analysis is correctly done, which it clearly was not, mitigation is inadequate. The document relies on infeasible mitigation measures in several major resource areas which are insufficient to reduce potential impacts to a less than significant level for other impacts and other resource areas. Some examples include: [¶] a. Groundwater. [¶] Assessment of existing water usage and groundwater levels will not occur until after Project approval. This constitutes impermissible deferred mitigation. [¶] Given the fractured bedrock nature of the aquifer, the mitigation measure meant to prevent excess loss of groundwater through seepage (Mitigation Measure 4.8-2) is infeasible. The mitigation measure relies on borings to determine whether mining may be planned close to the groundwater table; in fractured bedrock, where groundwater flow occurs primarily through fractures, borings will not be able to correctly predict the location of the groundwater table. The County's experience with the MST amply demonstrates that groundwater elevations, quality, and flowrates can vary tremendously between wells located in close proximity. [¶] The mitigation measure (Mitigation Measure 4.8-3) intended to ensure that groundwater consumption does not exceed the currently stated level of

54

140 acre-feet per year is inadequate because it fails to account for new consumptive uses associated with increased loss to evaporation from new/larger ponds, and the greatly increased surface area of the rock face.  No effort was made to assess the potential extent of seepage (although Syar should have been able to provide some characterization of current seepage levels.)  (See Parker Groundwater Report in the administrative record.)"

As to this ground, the Board concluded in relevant part:

"*Groundwater Mitigation:*  [¶] A licensed hydrologist prepared a comprehensive groundwater analysis and recommended appropriate mitigation measures to reduce impacts as set forth in the EIR.  For projects for which an EIR has been prepared, where substantial evidence supports the approving agency's conclusion that mitigation measures will be effective, courts will uphold such measures against attacks based on their alleged inadequacy.  (*Laurel Heights*, *supra*,47 Cal.3d at p. 407; *Sacramento Old City Assn. v. City Council* (1991) 229 CaI.App.3d 1011, 1027.)  Similarly, substantial evidence shows the mitigation measures were adequate.  (See *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 495 . . . [mitigation may include 'minimizing impacts by limiting the degree or magnitude of the action' and 'compensating for the impact by replacing or providing substitute resources or environments'].)  The Board has considerable discretion in determining the effectiveness of mitigation measures.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 . . . ['the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable" '; court cannot ' "determine who has the better argument' "]; see also *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 CaI.App.4th 1209, 1233.)

"With respect to evaporative losses, they were addressed by Mitigation Measure 4.8-2, which protects against potential persistent open water bodies created when mining intersects the groundwater elevation, substantially increasing evaporation losses.  Evaporative loss can also occur when the groundwater recharge mechanisms are interfered with, such as when subsurface flow in fractures or soil is exposed or intercepted by mining.  However, Mitigation Measure 4.8-2 requires that any subsurface flow in fractures or soil that is exposed or

intercepted by the excavation be re-infiltrated within the same watershed boundaries. This mitigation also includes spring season monitoring concurrent with the SWPPP monitoring (required by Mitigation Measure 4.8-1) to verify that springs and subsurface flow exposed as a result of mining activities are infiltrated back into the subsurface before reaching the surface flow channels."

As to SSE's claim of inadequate "plans and reports" to support approval of the mining permit ground, the Board quoted the ground verbatim. And as to *Wells and Water Use,*" the Board concluded:

"The Draft EIR accurately describes baseline water use of the project and future project demand in Appendix K. Appellant SSE's reference to one page from a 1973 EIR does not reflect the current water use at the quarry and in fact the reference to one million gallons a day appears to be a description of the wells daily production, not the water use occurring at the quarry. As discussed in the Draft EIR, Final EIR, the Appendices, and other responses to comments, the majority of water use at the quarry is associated with the application of water for dust control purposes, which in the 1973 EIR is stated as 80,000 gallons per day, therefore, to assume that the quarry utilized an additional 920,000 gallons a day is mere speculation. Most importantly even assuming for argument sake that the quarry prior to Syar Industries purchase of the site utilized 1,000,000 gallons of water a day, the evidence in the record establishes that it no longer does so. The Draft EIR accurately measure baseline water use and requires ongoing monitoring and reporting to [e]nsure that the baseline water use of 140.6 acre-feet per year is not exceeded. The Draft EIR evaluated the two wells utilized by the project for water supply, the Quarry Well and Latour Court Well. No other wells are currently being utilized. Mitigation Measure 4.8-4 requires monitoring and restricts groundwater use to a maximum of 140.6 acre-feet per year." [23]

_____

[23] SSE also points to what appears to be a PowerPoint document prepared for a hearing on March 22, 2016. That document lists, under the heading "Stop Syar Expansion Appeal Grounds," the ground of "Inadequate impact and mitigation assessment due to incorrect baseline and modeling techniques primarily associated with [¶] Air Quality and Health Risk [,] Noise[,] Groundwater Hydrology and use[,] Aesthetics." This, however, was simply another articulation of SSE's generic complaints about the baselines

In short, the Board of Supervisors, in accordance with the County's appeal ordinance, addressed and made findings only as to the stated grounds before it, none of which fairly raised the sand production-related issues SSE has pursued here.

The trial court nevertheless concluded SSE had exhausted its administrative remedies, stating: "[T]he Court interprets Petitioner's arguments relating to the EIR's water supply analysis more broadly, as an assertion that the EIR fails to adequately analyze the existing water supply, and the water supply planning for the Project. The court finds that Petitioner did raise these issues in its appellate packet [citation] in a manner sufficient to give the County 'the opportunity to evaluate and respond to them.'"

We agree that SSE "broadly" raised the issue of the water usage baseline, but that is not the standard for exhaustion. Rather, " ' " 'the exact issue' " ' must have been presented to the administrative agency." (*South of Market, supra,* 33 Cal.App.5th at p. 347; *North Coast Rivers, supra,* 216 Cal.App.4th at p. 623.) Objections must be " 'sufficiently specific' " to apprise the agency of the asserted deficiency, so it can " 'evaluate and respond' " and have an " ' " ' "opportunity to act and to render litigation unnecessary." ' " ' " (*North Coast Rivers,* at p. 623.) The Board of Supervisors was not so apprised as to the sand production related issues about the water usage baseline SSE has pursued here. Thus, SSE did not exhaust its administrative remedies in this regard.

---

and did not apprise the Board of the water usage baseline complaints related to sand production it has raised in this court action.

57

*Merits*

Even assuming SSE exhausted its administrative remedies, there is no merit to its challenge to the water usage baseline.

The water usage baseline and the EIR's water impact analysis is based on the "Syar Napa Quarry Water Supply Assessment" (Water Supply Assessment) prepared by County consultants during the environmental review process.[24]  The assessment explains how the usage baseline was determined as follows:

Syar operates two water supply systems associated with the quarry. The systems are supplied by two wells, the Latour Court Well and the Quarry Well, and by surface water detention ponds.

Water is used at the quarry for dust suppression, sand and gravel washing, bathrooms at the Syar site offices, and irrigation of "reclamation re-vegetation."  The Latour Court Well supplies potable water to the Syar offices, as well as to the offices of other companies.  The Quarry Well supplies "non-potable water for quarry operations."  The surface water detention ponds supply water for dust suppression and for "washing sand and aggregate materials."

The quarry facilities are not connected to a municipal water source. During the years the quarry has been in existence, "there has not been a need to account for the amount of water required [because]. . . [w]ater has always been available in abundance by way of a water well field that was developed by the C&H Sugar Company many years ago. . . ."

The Water Supply Assessment relied in part on the production baseline, which was determined, as we have discussed, by averaging annual quarry production for the preceding five years.

---

[24]  This assessment is attached to the EIR as Appendix K.

Because water usage had, historically, not been measured and was not measured during that five-year period, the assessment next examined three sources of data to arrive at a baseline water usage number.

First, the assessment looked at the extraction rates from the Latour Court Well, which was metered starting in 2011. Second, as to the Quarry Well, the assessment looked at a combination of metered flow for a six-month period in 2009 and actual truck counts filling from the well. It then approximated extraction for the remaining months of 2009 "by scaling the pumping rates [from the six-month period] to match the percent increase/decrease observed in the Latour Court Well." Third, to estimate water use from the surface-water detention ponds, the assessment used the number of water truck fillings during a 20-day period in May 2009, and based on this, arrived at "a typical monthly pond extraction rate."

Based on this data, the Water Supply Assessment estimated the annual total water usage for 2009 to 2011 from the Latour Court Well as 17,974,900 gallons, from the Quarry Well as 13,515,00 gallons, and from the surface ponds as 9,714,000 gallons (which assumed pumping occurred only from May through September[25]). Thus, the assessment concluded the average total annual water usage for the years 2009-2011 was 41,203,900 gallons

The Water Supply Assessment then compared average annual sand production for this same time period, 44,329 tons, and factored in that it takes 25 gallons of water to produce one ton. The assessment thus calculated the amount of water used for sand production for 2009-2011 as 1,108,225

---

[25] The assessment pointed out water usage from the ponds for dust suppression occurs only from May through September.

gallons. This, in turn, was 2.7 percent of the total annual water usage for those years.

The assessment then returned to the baseline sand production—49,474 tons (an average of the "known sand production" for the preceding five years). Multiplied by the sand production water usage figure of 25 gallons per ton, this resulted in a baseline water usage of 1,236,850 gallons for sand production. The assessment then factored in that water usage for sand production during the 2009-2011 period accounted for only 2.7 percent of total usage, and using this same percentage, calculated the baseline total water usage as about 45.8 million gallons.[26]

SSE complains the EIR water usage baseline "scrapes together an assortment of information regarding water use" from 2009-2011, resulting in an "unsupported estimate" of quarry water usage, which is then "significantly scaled-up to form the baseline water usage" and "fails to provide the most accurate picture."

As detailed above, the EIR does, indeed, rely on "an assortment of information regarding water usage." Neither the data on which it relies, nor the methodology used to estimate baseline water usage, however, are "unsupported." Rather, because there had always been ample water for the aggregate operation and because metering was not required as of the baseline date, the water supply assessment had to devise a reasonable methodology for estimating the baseline water usage.

_____

[26] The County commissioned a second water assessment that used an entirely different methodology. It calculated baseline water usage "by combining the site description and geological setting information with monitoring data from: rainfall, evaporation/evapotranspiration, stream gages, pond gages, groundwater elevation piezometers, and field observation." The study concluded the estimated baseline annual quarry water usage was about 48.8 million gallons.

As we have recited, SSE maintains the Water Supply Assessment used by the County is deficient in two respects.

First, it takes issue with the baseline sand production number of 49,474 tons (the average annual production during the five-year baseline period).[27]  SSE claims "[t]here are conflicting amounts used throughout the EIR" regarding the amount of sand production during that time period and the EIR "relies on the highest estimate."  Specifically, SSE points to a lower annual sand production number of 37,688 tons, found in the "Air Quality and Health Risk Impact Assessment" (AQ Assessment) prepared by another consultant and attached as Appendix I to the Draft EIR.  That lower number, however, is in a chart covering that same five-year timeframe titled "Total Quarry Production *Shipped by Truck*."  (Italics added.)  The AQ Assessment, of course, was concerned with emissions from truck traffic, so focused on truck records and not the actual "known" sand production amounts used in the Water Supply Assessment.

SSE also claims the Water Supply Assessment incorrectly "assumes that sand production water use would also be 2.7 percent of the total water usage in 2004-2008."  SSE does not explain, however, why it was not reasonable for the County to make the assumption that the percent of the total water usage used for sand production during the 2009 to 2011 timeframe would be similar to that during the preceding five year timeframe.

---

[27]  The Water Assessment states it is based on "the five-year average production rates from 2004 through 2009."  As the trial court noted, a five-year period includes 2004, 2005, 2006, 2007 and 2008, but does not include 2009.  It also appears to have been assumed that the five-years of production figures that were averaged to provide the production baseline figure were the five years *preceding* the 2009 date of publication of the notice of preparation.

In sum, the Water Supply Assessment and EIR explain in considerable detail the methodology the County chose to use to determine the water usage baseline and the reasons for that choice. This discussion adequately allowed for public discussion and informed decision-making. (See *South of Market, supra,* 33 Cal.App.5th at p. 354 [" ' "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." ' " Quoting *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145].)

SSE claims water usage for dust control does not increase proportionally with increased production and therefore there is "no evidentiary support for the scaling-up of water usage during the baseline years beyond the approximately 2.7 percent of the water used for sand washing." "There is," according to SSE, no "factual support for the [assessment's] significant scale-up of the water usage for dust control." We are at a loss as to SSE's point. As we have discussed, the Water Supply Assessment determined that 2.7 percent of the total water usage during the 2009-2011 timeframe was for sand processing and the remaining 97.3 percent was used for other purposes. It then applied that same correlation to the preceding five-year time period, and based on known sand production for that period, arrived at a total water usage number for both sand production and for other uses during that prior time period. We fail to see how this "significantly scaled up" the water usage for dust control during the preceding five-year timeframe and, in turn, the baseline.

In fact, the Water Supply Assessment recognized there is not necessarily a proportional increase in both quarry production and water usage for dust control, stating: "The *proposed increase* in mining production does not necessarily relate to a proportional increase in water consumption,

62

because the same number of roads and stockpiles will require dust suppression regardless of the total production amounts." (Italics added.) But as between the preceding five-years and the 2009-2011 time periods, there was no increase in the size of the quarry operation, suggesting the water required for dust control would likely be reasonably equivalent during both time periods.

SSE cites to *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 (*Monterey*). In that case, the draft EIR established a "baseline of 45 acre-feet per year, based on the representation by the owners that 21 acres were irrigated." (*Id.* at p. 120.) It acknowledged, however, there was " 'no documentation' " of "any substantial irrigation prior to 1997," the year of the draft EIR, and no well reports regarding the property. (*Id.* at pp. 109, 120-121.) "[S]parse" records of water use on the property existed for five years. (*Id.* at p. 121.) There was also "a temporary aquifer test conducted in 1991 [which] produced 1.20 acre-feet," and aquifer testing in 1992 which produced "40.68 acre-feet." (*Ibid.*) In the three years before the development application, "water production totals were 11.58 acre-feet, 0.40 acre-feet, and 1.08 acre-feet." (*Ibid.*) After the development application was submitted, water production was measured at 78.34 acre-feet, 34.04 acre-feet in 1998, and 41.14 acre-feet for a portion of 1999. (*Id.* at p. 123.)

In the "Supplemental Information and Errata" to the EIR, "several possible combinations and averages of these production numbers" were suggested. (*Monterey*, *supra*, 87 Cal.App.4th at p. 123.) The baseline figure adopted by the Board, 51 acre-feet per year, was "an average of the water meter readings in the past three years." (*Ibid.*)

The *Monterey* court had "no objection to the EIR's methodology of estimating historical water use on property where no documentation is available to verify actual use." (*Monterey*, *supra*, 87 Cal.App.4th at p. 121.) Indeed, the court explained "If the determination of a baseline condition requires choosing between conflicting expert opinions or differing methodologies, it is the function of the agency to make those choices based on all of the evidence." (*Id*. at p. 120.)

The court noted, however, that the data on which the calculation was based was "clearly faulty" because "several of the figures on the water production chart do not represent water actually used for irrigating the property." (*Monterey*, *supra*, 87 Cal.App.4th at p. 123, italics omitted.) It noted, as an example, that the 78.34 acre-feet figure for 1997 included 52-acre-feet produced during aquifer testing. (*Id*. at p. 123.) "A baseline figure," said the court, "must represent an environmental condition existing on the property prior to the project. There is simply no justification for using a total of 78.34 acre-feet of water as part of a baseline calculation for this property, when the evidence was that 52 acre-feet of this amount was pumped for the purpose of aquifer testing and was discharged into the Carmel River." (*Ibid*.) "[E]stimating water used for irrigation where there was no substantial evidence to show that the property was in fact irrigated does not accurately reflect existing conditions." (*Id*. at p. 121.)

The baseline calculation here has no comparable "clearly faulty" figure. The water usage baseline was estimated by using "known" sand production amounts during all referenced time periods, using an undisputed gallon figure required for sand production, and using water use data for time periods for which there were records. None of this information was plainly erroneous, unlike in *Monterey*.

64

At bottom, SSE disagrees with the County's chosen methodology for determining the baseline given the lack of complete water usage records for 2009 and no records for the preceding five years on which the baseline was based. However, as *Monterey*, itself, confirms, where "the determination of a baseline condition requires choosing between conflicting expert opinions or differing methodologies, it is the function of the agency to make those choices based on all of the evidence." (*Monterey, supra,* 87 Cal.App.4th at p. 120.) The EIR, which incorporates the Water Supply Assessment, explains the County's choice of methodology and reasons for it, and it cannot be said that the County's approach is marred by plainly faulty data or is unreasonable. (See *South of Market, supra,* 33 Cal.App.5th at p. 334 ["when assessing the legal sufficiency of an EIR, we do not look for perfection, but 'adequacy, completeness, and a good faith effort at full disclosure' "].)

### *Water Use Mitigation Measure*

In a related vein, SSE maintains Mitigation Measure 4.8-4 is inadequate because it sets a cap on quarry groundwater usage based on the asserted "hypothetical" water usage baseline. SSE additionally claims an "enforcement mechanism" for the usage cap is "lacking."

Again, even assuming SSE exhausted its administrative remedies as to these complaints (we note none of its grounds of appeal mention Mitigation Measure 4.8-4), they are without merit.

We have already determined SSE's challenge to the supposedly "hypothetical" water usage baseline lacks merit. We therefore consider here only SSE's complaint that there is no "enforcement" of Mitigation Measure 4.8-4's usage "cap."

As we have discussed, the Water Supply Assessment explained that water usage was not metered during the five-year baseline period because

65

water was drawn from private sources and there was always ample water for quarry production. The assessment further discussed that it was anticipated that the project would continue to use extracted water at the baseline rate, and if additional water is needed, it will be procured from other sources, including the Napa Sanitation District's recycled waste water program. The assessment went on to estimate that some 16 million additional gallons of water might be needed for the projected increased production. This would be met through several means, including: "recycled water from the City of Napa," "water recovery system at its sand plant to recycle the water that is used in washing the sand," and/or reduced water demands by alternative dust suppression methods, such as gravel application to roads and spray surfactants.

As set forth in the draft EIR, Mitigation Measure 4.8-4 provided: "Avoid depleting groundwater supplies by water reuse and obtaining new supplies of additional water for operations." The explanation of the mitigation measure provided: "If additional [water] is required for the proposed project, this additional water will be obtained from off-site sources. . . . Off-site sources of recycled water are available and water can be purchased from public or private sources. If additional water sources are not available then production volume will be reduced to the extent that the water use does not exceed the maximum allowable annual usage [of] 45.8 million gallons (140.6 acre-ft) per year." The draft further explained, "[n]o additional water from on-site resources is available to accommodate the additional water demand of the proposed project. The maximum allowable annual usage is 45.8 million gallons. . . . This mitigation measure includes metering to verify that demands upon on-site water are not exceeded." "In order to monitor the use of the existing on-site sources, metering and record keeping

66

are required.  Mitigation would include metering of all water use at the site. . . . [¶] . . . [¶] . . .The total of groundwater/surface water used for quarry operations would be totaled and reported annually.  The annual usage would be compared against the baseline usage on an annual basis."

During the review process, Mitigation Measure 4.8-4 was augmented with the following language:  "Any new or additional water sources for Quarry operations shall [be] subject to additional environmental review pursuant to CEQA and modification of this surface mining permit.  The County Engineering and Conservation Division shall monitor this requirement.  Compliance [with] this measure shall be subject to Article VI (Enforcement) of Napa County Code Chapter 16.12 (Surface Mining and Reclamation)."

Thus, the "cap" imposed by the Mitigation Measure is enforceable, both through metering and the enforcement provisions of the County Code.  (See Napa County Code, §16.12.660, subd. (a) ["Any person who operates, maintains or causes to be operated or maintained any surface mining operation which is not in conformance with the provisions of this chapter, the exploration or surface mining permit issued, or any requirement, term or condition of a master mining plan approved for the site being mined is guilty of a misdemeanor."])

***Water Quality Impacts***

As to water quality, SSE asserts the EIR (1) failed to disclose baseline water quality conditions, and (2) failed to analyze water quality impacts of using a surfactant, a substance added to water to enhance effectiveness for dust control.

*Exhaustion*

The trial court ruled SSE failed to exhaust its administrative remedies as to these water quality issues.

SSE claims it did so, citing to the following language (which we have italicized) in its first appeal packet supporting its appeal of the EIR certification (again, we quote the entirety of ground):

"f. *Groundwater depletion and increased sediment effect on steelhead trout and Western Pond Turtles.*

"Both steelhead trout, on the Endangered Specie[s] List as threatened status, and Western Pond Turtles, a specie of concern warranting full protection of their habitat, are found in Project's expansion area. Neither the EIR nor the responses to public comments adequately address the Project's exacerbation of groundwater depletion in the MST Groundwater Deficient Area and its destruction of the Cayetano and Marie creeks and their watersheds. *There is no adequate discussion of the biological/aquatic resource impacts from the Project's increase in toxic sediment discharges to the Cayetano/Marie watersheds.* There is no analysis or mitigation proposed for the destruction of habitat for the steelhead and the turtles. See comment letter from Living Rivers Council in administrative record." (Second italics added.)

SSE also points to the following language (which we have italicized) in its second appeal packet supporting its appeal of the project and permit approvals (again, we quote the language in context):

"IX. PERMIT APPROVAL DOES NOT COMPLY WITH SMARA

"SMARA requires, inter alia, that a reclamation plan contain a description of the manner in which contaminants will be controlled. See Public Resources Code section 2772. *There is no evidence in the record of a description of how contaminants will be controlled.*"

68

Neither of these stated grounds of appeal comes close to advising the Board of Supervisors as to the water quality issues SSE has advanced in this court action.

SSE also cites to another ground set forth in its second appeal packet, entitled: "XIX. <u>POPE CREEK QUARRY SHUT DOWN DURING PENDENCY OF SYAR APPICATION.</u>"  However, this ground concerned a *different,* "much smaller" quarry that was shut down in 2011, and as to which the County had some difficulty in enforcing waste and debris mitigation. Again, there is no way the Board of Supervisors would have divined from this ground, that SSE was complaining about the lack of a water quality baseline and the use of surfactant to enhance dust control.

SSE also maintains its explicit "incorporation" of the Parker Groundwater Report in its first appeal packet sufficed to raise the water quality issues it raises here.  But SSE did not "incorporate" that report and instead merely referenced it—"See Parker Groundwater Report in the administrative record" (at a location it did not mention)—as support for a *different* ground of appeal.  Indeed, this reference was in support of a claim there were no sufficient mitigation measures "to prevent excess loss of groundwater through seepage," as "[n]o effort was made to assess the potential extent of seepage."  SSE is not, in this appeal, complaining about groundwater loss through seepage.

SSE's claim that the "County's response to the appeal understood this comment to address inadequacies of the SWPPP and water quality mitigation" is likewise meritless.  SSE cites to a page in a "Staff Report for Napa County Board of Supervisors Syar Appeal Hearing," without identifying any specific language.  That page discusses "Contaminant Control" in the context of hazardous waste removal and identifies licensed waste transport

69

contractors. It mentions "control of contaminants also extends to air quality," but makes no mention of water quality.

Not surprisingly, the Board of Supervisors decision reflects it did not understand SSE to be claiming the EIR was deficient because it failed to establish a water quality baseline and failed to assess the impact of surfactant use. Rather, as the Board's decision shows, the Board addressed only the grounds that were fairly before it—namely the adequacy of analysis of impacts on steelhead and turtles, and compliance with Surface Mining Act requirements pertaining to reclamation of mined areas.

As to the surfactant issue only, SSE additionally points out the Board of Supervisors addressed the issue in its 37-page decision addressing the appeal of another objector, Skyline Park Citizens Association (Skyline Park). Among its stated grounds of appeal, Skyline Park included, as issue #4, the following: "The EIR fails to identify an adequate supply of water to serve the Project at the approved production levels, fails to evaluate the environmental impacts of reasonably foreseeable means whereby the Project's existing water supply can and will need to be supplemented to sustain those production levels, and fails to adequately protect groundwater resources in the MST groundwater deficient area." As we discuss below, the Board recounted how this ground embraced the use of surfactant, and addressed Skyline's concern at length.

We have considerable doubt that SSE can point to the efforts of another objector to establish that SSE exhausted its administrative remedies. The Napa County appeals ordinance requires an appellant to state its grounds of appeal and expressly states grounds not raised are waived. (Napa County Code, § 2.88.050(C)(4)-(6).) And in accordance with the dictates of the ordinance, the Board of Supervisors rendered separate decisions as to *each*

70

appellant and, as to each, addressed only the grounds raised by *that* appellant.

Furthermore, Skyline Park filed its own court action challenging the Board's decision denying its administrative appeal. And in that court action, Skyline raised the issue of surfactant use, alleging "The EIR fails to analyze the environmental impacts of Syar's use of chemical dust suppressants to achieve its water conservation goal." Skyline eventually reached a settlement with the County, and its action was then dismissed with prejudice. Given that this dismissal constituted a final judgment on the merits, it had preclusive effect not only as to the claims Skyline raised, like the use of surfactants, but also as to claims it could have raised. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896–897.)

SSE points out it was not a party to Skyline Park's court action. However, it is now well-established that an objector will be precluded from relitigating CEQA issues where a final judgment has been entered in a court action brought by another objector and there is a community of interest—or, privity—between the two objectors. (See *Inland Oversight Committee v. City of San Bernardino* (2018) 27 Cal.App.5th 771, 781–782; *Atwell v. City of Rohnert Park* (2018) 27 Cal.App.5th 692, 699; *Citizens for Open Access ect. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1071–1072.) We have no difficulty concluding there was such privity between SSE and Skyline Park. After all, SSE is relying on Skyline Park's administrative appeal efforts to establish that it exhausted its administrative remedies. We fail to see how SSE can align itself with Skyline Park for purposes of exhausting administrative remedies, but then disclaim any community of interest for purposes of the preclusive effect of Skyline Park's litigation efforts.

71

*Merits*

In any case, even assuming SSE exhausted its administrative remedies, neither of its complaints about water quality have merit.

As we have recited, the first of SSE's water quality complaints is that the EIR fails to disclose baseline water quality conditions. Specifically, SSE complains the EIR "fails to disclose that the Quarry's water quality baseline is one of recurrent pollution."

However, the EIR discloses exactly that, stating as follows: "The project could result in a violation of water quality standards or waste discharge requirement by employing quarry practices that would cause substantial erosion or sedimentation on- or off-site. . . . The Syar Napa Quarry currently has a SWPPP [Stormwater Pollution Prevention Plan] as part of Syar NPDES Permit for Industrial Activities and would continue to do so under the project. The SWPPP describes and dictates management practices to prevent contaminants from entering storm water discharge and prevent unauthorized non-storm water discharges. . . . Compliance with sediment discharge limits is monitored by comparing the discharge from the site to EPA suggested benchmarks. Monitoring of storm water discharges from the Syar Napa Quarry has indicated that EPA suggested benchmark standards have been exceeded. A tabulation of surface water sampling results is provided in Appendix D of the Winzler & Kelly 2012 report," attached to the DEIR.

SSE maintains this discussion is inadequate due to its reference to Appendix D, a disclosure which, according to SSE, must be "made in the EIR itself and not buried as an afterthought, tacked onto an appendix." SSE cites to *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918 (*Banning*) and *Vineyard Area Citizens for Responsible Growth Inc. v. City of*

72

*Rancho Cordova* (2007) 40 Cal.4th 412 (*Vineyard*).  These cases stated, "[t]he data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices" or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis." ' "  (*Vineyard*, at p. 442; see *Banning,* at pp. 940–941.)

In *Vineyard*, the court observed, "A reader of the FEIR could not reasonably be expected to ferret out an ***un***referenced discussion in the earlier Water Forum Proposal, interpret that discussion's unexplained figures without assistance, and spontaneously incorporate them into the FEIR's own discussion of total projected supply and demand."  (*Vineyard*, *supra*, 40 Cal.4th at p. 442, italics & bold added.)  Thus, "[t]o the extent the County, in certifying the FEIR as complete, relied on information *not actually incorporated or described and referenced in the FEIR*, it failed to proceed in the manner provided in CEQA." (*Ibid.*, italics added; see *Banning*, *supra,* 2 Cal.5th at pp. 940–941.)

Here, in contrast, discharge containment was both generally discussed in the EIR and the detailed analytical data was expressly referenced in an identified appendix.  Thus, the information was "presented in a manner calculated to adequately inform the public and decision makers."  (*Vineyard*, *supra*, 40 Cal.4th at p. 442.)

SSE's second water quality complaint is that the EIR failed to analyze the potential impact of using surfactants.

The draft EIR noted that "[n]o additional water from on-site resources is available to accommodate the additional water demand of the project." Accordingly, Mitigation Measure 4.8-4 stated in pertinent part:  "Mitigation

73

also will be applied by off-setting the need for additional water by reuse of the water and gains in process efficiency.  This could include gravel application for roadways and production areas to reduce dust generation and the need for dust suppression by water application."  The draft EIR also discussed "fugitive dust,"  and in that regard referenced Mitigation Measure 4.3-2B which provided in pertinent part:  "Maintain chemical dust suppressant, equivalent dust suppressant that achieves similar control, on the unpaved road surfaces as described in the manufacturer's specifications.  Material used for chemical dust suppressant shall not violate State Water Quality Control Board standards.  Materials accepted by the California Air Resources Board and the US EPA, and which meet State water quality standards shall be considered acceptable."

As we have discussed, Skyline Park raised the issue of sufficient water for mining operations, and Board of Supervisors addressed the issue, including the use of surfactants to enhance existing water resources, in its decision on Skyline's appeal.  The Board first discussed the background of the issue, explaining that during the environmental review process, and in response to Skyline's concern about the use of alternative water resources, Syar had "determined it could feasibly achieve the reduced maximum annual production rate of 1.3 million tons without exceeding baseline water use via water conservation technologies, as discussed in the Draft EIR mitigation measures, Water Availability Analysis, and Air Quality Analysis.  The water conservation technologies include graveling or paving roads, using surfactants, reusing wash water, and other methods that reduce the use of water for dust suppression."  Syar and the County's EIR consultant then "provided evidence regarding the feasibility of achieving full production within the maximum water use limitations.  [Syar's] evidence of feasibility

74

was focused on the use of surfactants on heavy traffic areas due to the readily available information regarding its effectiveness in reducing water demand. In practice, [Syar] would use numerous technologies to increase water use efficiency and make adjustments based on monitoring data to achieve compliance with the maximum allowable groundwater use of 140.6 acre-feet per year."

The Board then turned to Skyline Park's concern that Syar's "agreeing not to exceed its baseline water use via increased efficiencies and water conservation" raised, in turn, concern "that the use of such technologies, like surfactants on road surfaces was a change in the mitigation measure or new information that would require additional environmental review." The Board stated it had "received evidence from both the Applicant and Appellants and heard testimony from the County EIR Consultant." The consultant "stated that the EIR already considered the use of surfactants and other technologies in the project's Water Availability Analysis and Air Quality Modeling and that such use was consistent with the proposed mitigation measures. Notably, under Mitigation Measure 4.3-2B, the Applicant may only use dust suppressants that the California Water Quality Control Board, the California Air Resources Board and the United States Environmental Protection Agency has approved. While some types of surfactants could have environmental impacts, the EIR Consultant stated that many surfactants were composed of nontoxic plant material and do not result in any impacts. The Board also head from County staff that environmentally friendly surfactants were in common use throughout the Napa Valley in agricultural areas. Further, the Project's Industrial Storm Water Permit monitors water quality impacts and would effectively address any possible impacts. The EIR consultant also clarified that the use of surfactants was not new information since the use of

75

surfactants was expressly provided for in air quality mitigation and discussed in the Draft EIR and its appendices."

The Board went on to explain that "[i]n response," it had "directed staff to clarify in the mitigation measures, consistent with the Draft EIR, that only non-toxic surfactants would be allowed. . . ."

The Board then set forth the entirety of the three pertinent and lengthy mitigation measures, indicating the modifications. For example, Mitigation Measure 4.8-4 was augmented with language stating, *inter alia,* "The Permittee shall review the monitoring data on a monthly basis to confirm the status of its annual water use. The total of groundwater/surface water used for quarry operations shall be totaled and reported monthly to the County." Mitigation Measure 4.8-4 was also modified to eliminate any reliance on new water sources to meet quarry demand. Instead, "[t]he Permittee shall also off-set additional water demands by reusing water and increasing processing efficiencies. This could include gravel, pavement, and surfactant application to roadways and production areas to reduce dust generation and the need for dust suppression by water application, as discussed in Mitigation Measure 4.3-2b and Draft EIR, Appendix J." As modified, the measure further specified, "[t]his permit does not authorize the consumptive use of water for any source in excess of 140.6 acre-ft per year, regardless if obtained outside the MST."

Mitigation Measure 4.3-2b was also augmented with the following language: "Materials used for chemical dust suppressant shall include any non-toxic chemical or organic dust suppressant or stabilizer and shall not violate State Water Quality Control Board standards. Materials accepted by the California Air Resources Board and the U.S. EPA, and which meet state water quality standards shall be considered acceptable. The permittee shall

76

maintain records on dust suppressant use and any other supporting documentation to verify compliance with the conditions above.  Such records shall include type of control measure(s) used, location and extent of coverage, date of use, amount, and frequency of application, including product information sheets that identify the name of the dust suppressant(s) and application instructions.  Records shall be maintained for five (5) years, and shall be submitted to the PBES Department annually, as required by COA No. 2 (L)."

In sum, as the Board of Supervisors recognized, the Draft EIR *did* analyze the use of surfactants and did so specifically in the context of their use—to control dust.  Moreover, the issue was adequately examined during the administrative appeal process.  And while SSE suggests it was improper to modify and enhance the pertinent mitigation measures during that process, that is incorrect.  One of the important purposes of the exhaustion doctrine is to allow agencies the opportunity to review, and to address, asserted deficiencies in the environmental review.  (See *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 794; quoting *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384.)  Indeed, "[a]fter a project has been approved and while it is still being developed a mitigation measure or condition of approval may be changed or deleted if the measure has been found to be impractical or unworkable." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1508–1509.)

### Consistency with General Plan

SSE lastly contends the EIR failed to address the project's asserted inconsistencies with the County's general plan.

***Not A CEQA Issue***

In the trial court, the County and Syar pointed out an EIR must address only *in*consistencies with a general plan. Because the County determined the project is consistent with its general plan, they maintained the EIR is not deficient in this regard. Further, to challenge the County's consistency determination, the County and Syar maintained SSE was required to proceed by way of a separate cause of action under Code of Civil Procedure section 1085 for ordinary mandamus, or a separate proceeding for such—neither of which SSE pursued. The trial court agreed and therefore did not consider the merits of SSE's general plan consistency argument.

In *The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 893–894 (*Highway 68*), the Court of Appeal explained, "the issue of whether a proposed project is consistent with a county's general plan is not a CEQA issue, and therefore the mandate procedures provided for CEQA violations at section 21168.9 do not apply. The CEQA Guidelines provide: 'The EIR shall discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans.' (Guidelines, § 15125, subd. (d).) Thus, as this court has stated, ' " '[w]hile there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan. [Citation.]' [Citation.] 'Because EIRs are required only to evaluate "any *inconsistencies*" with plans, no analysis should be required if the project is *consistent* with the relevant plans. [Citation.]' [Citation.]" [Citation.]' (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1566.)"

Rather, an " 'agency's decisions regarding project consistency with a general plan are reviewed by ordinary mandamus.' (*San Francisco*

78

*Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515. . . .)" (*Highway 68, supra,* 14 Cal.App.5th at p. 894.)

The *Highway 68* court went on to explain, "[u]nder the Government Code, every county and city is required to adopt ' "a comprehensive, long-term general plan for the physical development of the county or city. . . ." (Gov. Code, § 65300.) . . . " '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.]" [Citation.]' (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815. . . .) [¶] ' " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' [Citation.]" [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan. . . .' (*Friends of Lagoon Valley, . . .* at p. 817.)" (*Highway 68, supra,* 14 Cal.App.5th at p. 896.)

The *Highway 68* court then addressed the applicable standard of judicial review. " 'When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] . . . A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' " (*Highway 68, supra,* 14 Cal.App.5th at p. 896, quoting *Monterey, supra,* 87 Cal.App.4th at p. 142.)

"Accordingly, an agency's 'findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no

79

reasonable person could have reached the same conclusion. [Citation.]' (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648. . . .) The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 639. . . .)" (*Highway 68, supra,* 14 Cal.App.5th at p. 896.)

Despite its attention having been directed to *Highway 68,* SSE did not, in the trial court, ask for leave to amend its writ petition to add a cause of action for ordinary mandamus under Code of Civil Procedure section 1085. Nor did it make any general plan inconsistency argument based on the standards of judicial review applicable to ordinary mandamus and, specifically, to an agency's consistency determination.

On appeal, SSE maintains it was not required to challenge the County's determination that the project is *consistent* with its general plan by way of ordinary mandamus. Rather, as we understand SSE's argument, it contends "consistency" and "inconsistency" for purposes of CEQA mean something different than in the context of general planning and land use law. SSE explains as follows: "The injury that [it] claims is not the Project's inconsistency with the General Plan as a whole as would be addressed by a Planning and Zoning Law (Gov. Code, § 65000 et seq.) action, but rather the *failure to adequately inform the public and decisionmakers* about inconsistencies with any policies as required by CEQA. Such information would apprise the public and decisionmakers with the potential impacts of the inconsistency and advise the public of the basis for the County's determination." In fact, SSE expressly states it "is not arguing that the Project approval must be set aside due to inconsistency with the General

80

Plan as a violation of the Planning and Zoning law, but rather that the EIR failed to disclose inconsistencies with the General Plan as a violation of CEQA's informational requirement."

Try as SSE might to explain that it is not challenging the County's substantive consistency determination, that appears to be exactly what SSE is doing, as it repeatedly maintains the EIR "failed to disclose inconsistencies" with the General Plan. It also appears that SSE's specific complaint is that the EIR failed to address asserted inconsistencies with "AWOS" (agriculture, watershed, and open space) designated lands.

Furthermore, SSE cites no authority supporting its assertion that "inconsistency" for CEQA purposes is different than for purposes of general planning and land use law. It points to CEQA guideline section 15125, subdivision (d). But as the *Highway 68* court pointed out, this guideline states: "The EIR shall discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans." (Guidelines, § 15125, subd. (d).) The guideline in no way suggests that as used in CEQA, the term "inconsistency" has an altogether different meaning than under basic planning and land use law. Indeed, while SSE maintains a different understanding of "inconsistency" must apply in the context of CEQA, it fails to articulate the standard for identifying such "inconsistencies." At some points in its briefing, SSE seems to suggest "potential" inconsistencies must be identified and addressed. But that is not what the guideline requires in a final EIR. And while SSE deems it readily apparent that there are general plan "inconsistencies" for purposes of CEQA, the County determined otherwise, suggesting SSE is advocating an eye-of-the-beholder approach. But such a subjective measure is even further removed from the mandate of the guideline. (Cf. *South of Market, supra,*

81

33 Cal.App.5th at p. 353 [" 'applicable plan' within meaning of Guidelines, § 15125, subd. (d) is plan that has already been adopted and thus legally applies to project; draft plans need not be evaluated,' " quoting *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145, fn. 7].)

In fact, we note that in *Golden Door II*, cited by SSE as support for other asserted deficiencies in the EIR, the Court of Appeal addressed whether the county-wide Climate Action Plan at issue was consistent with the County's general plan update that called for the reduction of greenhouse gases and adoption of a Climate Action Plan. (*Golden Door II, supra,* 50 Cal.App.5th at pp. 482, 486.) The appellate court did *not* treat this as a CEQA "informational" issue; rather, it applied the standard of judicial review applicable in ordinary mandamus to review an agency's consistency determination and concluded, "in light of the highly deferential standard of review," the trial court had erred in ruling the Climate Action Plan was "inconsistent" with County's general plan.[28] (*Id.* at p. 501.)

---

[28] At oral argument, SSE cited to *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903 (*Pocket Protectors*) and *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859 (*Eel River*), in support of its assertion *Highway 68* is in error as to the content of an EIR and scope of judicial review of a consistency determination. Both cases are distinguishable. The issue in *Pocket Protectors* was whether there was a "fair argument" the proposed project was inconsistent with the applicable PUD (Planning Unit Development) designation, requiring the preparation of an EIR. The court specifically contrasted the "much lower" standard applicable in this context than in the context of reviewing an EIR and an agency's ultimate consistency determination. (*Pocket Protectors, supra,* at pp. 933–936.) The issue in *Eel River* was whether the agency was required to consider whether the proposed project was consistent with local county general plans. The court concluded it was not, as the statute required only compliance with zoning and building ordinances. (*Eel River,* at p. 879.) Neither case dealt with a challenge to an agency's consistency determination made in the course of preparing a full EIR.

*Merits*

Even assuming SSE's "informational" standard of general plan
"consistency" under CEQA has merit (and we do not believe it does), the
project's consistency with the general plan was addressed throughout the
environmental review process.  The draft EIR, for example, included detailed
discussion—"each technical section of the DEIR (Chapter 4.1 through 4.17)
has been evaluated for consistency with policies contained in the existing
Napa County General Plan (2008)."  The County also prepared a "Syar Napa
Quarry Surface Mining Permit P08-0037 General Plan Consistency Analysis"
that was considered during the proceedings before both the Planning
Commission and the Board of Supervisors.  This provided ample basis for
public discussion of the project's consistency with the general plan and
informed decision-making.  (See *North Coast Rivers, supra,* 216 Cal.App.4th
at pp. 632–633 [detailed discussion of consistency with general plan not
required].)

We also observe that the Board of Supervisors addressed SSE's various
claims that the project was inconsistent with the general plan, including its
claim that it was inconsistent with AWOS-designation.  In this regard, the
Board's decision states:

"*General Plan Consistency:*

"The General Plan and Zoning consistency analysis in the EIR is for
informational purposes only and to disclose potential conflicts.  (CEQA
Guidelines Section 15125(d).)  It is not binding on the Commission or
the Board which are the bodies charged by law with interpreting the
County's land use policies and rendering the final determination on a
project's consistency or lack thereof.  (*San Francisco Upholding the
Downtown Plan v. City & County of San Francisco* (2002)
102 Cal.App.4th 656, 668.)  To assist the Commission with its
determination, staff prepared and released a detailed General Plan and
Zoning consistency analysis in August 2015.  Although the project
evaluated in this analysis was reduced production and reduced

83

footprint hybrid, the conclusions are still valid as to the Syar Modified Project Plus Area C—approved by the Planning Commission—since both the project evaluated in the analysis and the approved project include reduced production and reduced footprints from the originally proposed project evaluated in the EIR.

"The parcels within the Syar holding have General Plan Designation of AWOS, I and PI.  The Conservation and Recreation and Open Space (ROS) Elements provide the bulk of the County's goals and policies regarding conservation of natural areas and open space.  The ROS Element includes preservation of natural resources and the managed production of resources as one of the uses and benefits of open space.  [Citation.]  The Conservation Element has policies and actions that are intended to conserve open space lands that contain important natural resources that are associated with open space land use benefits.  [Citation.]  Within the Conservation Element the managed production of resources is specifically identified and addressed.  This element states that preserving open space resources to meet the community's conservation goals while also addressing local needs for productive raw natural materials requires a balanced approach and contains specific goals and policies that address open space as it pertains to the conservation of natural resources, and stresses the conservation and prudent management to the County's mineral resources for current and future generations.  [Citation.]  Agricultural Preservations and Land Use Policy AG/LU-93 further provides that the 'County supports the continued concentration of industrial uses in the South County area as an alternative to the conversion of agricultural land for industrial use elsewhere in the county.'

"As discussed above, aggregate mining and processing activities are allowed on the permittee's property, including the Pasini Parcel, with a surface mining permit.  The General Plan policies contemplate mining.  Because the current land use and zoning designations allow mining, neither a general plan land use re-designation nor a rezoning of the holding are necessary to accommodate the project.  Both the Quarry and the zoning code that allows for surface mining in any zoning district pre-date Measures J and P.  The Quarry has been in existence since the 1800s and . . . since 1955 the County Code has permitted surface mining in any zoning district with an approved surface mining permit and Measure J and P did not change this provision of the County Code.  (County Code Section 18.120.010(B)(3).)

84

"Furthermore, the project site, and portions thereof, are also mapped or classified by 1) the State Geologist as Resource Sector H, Mineral Resource Zone MRZ-2 (a), which indicates that significant deposits are present, and 2) the County Land Use Map as a Mineral Resource . . . area, which is applied to known mineral resources based on mapping prepared by the State of California. These [mineral resource] designations further reinforce that mining within the project site's land use and zoning designations is a contemplated and allowed use."

In sum, consistency with the general plan was discussed at length throughout the project review process. And while SSE's perspective is that the project is "inconsistent" with the County's general plan, on this record, it was the prerogative of the County to conclude otherwise. "Determining whether a project is consistent with general plan policies is left to the lead agency; '[i]t is, emphatically *not* the role of the courts to micromanage' " such decisions. (*North Coast Rivers, supra,* 216 Cal.App.5th at p. 632, italics added.)

## DISPOSITION

The trial court judgment is AFFIRMED. Each party to bear its costs on appeal.

85

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A158723, Stop Syar Expansion v. Napa County

Filed 4/23/21 after filing unpublished opinion 3/25/21

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STOP SYAR EXPANSION,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF NAPA,<br><br>     Defendant and Respondent;<br><br>SYAR INDUSTRIES, INC.,<br><br>     Real Party in Interest and<br>Respondent. | A158723<br><br>(Napa County<br>Super. Ct. No.<br>16CV001070)<br><br>**ORDER MODIFYING OPINION AND PARTIAL PUBLICATION; NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on March 25, 2021, be modified as follows:

1. Title designation on page 1 for Stop Stay Expansion is modified to read "Plaintiff and Appellant."

2. On page 1, the **INTRODUCTION** is modified to read "**I. INTRODUCTION**."

3. On page 2, the **DISCUSSION** is modified to read "**II. DISCUSSION**."

1

4. On page 2, the subheading ***Basic CEQA Principles and Standard of Review*** is modified to read "***A. Basic CEQA Principles and Standard of Review.***"

5. On page 6, the subheading ***General CEQA Exhaustion Principles*** is modified to read "***B. General CEQA Exhaustion Principles.***"

6. On page 17, the subheading ***Daily Particulate Emissions*** is modified to read "***C. Daily Particulate Emissions.***"

7. On page 25 the subheading ***Baseline for Truck Traffic Emissions*** is modified to read "***D. Baseline for Truck Traffic Emissions.***"

8. On page 25, the subsection ***Exhaustion*** is modified to read "***1. Exhaustion.***"

9. On page 28, the subsection ***Merits*** is modified to read "***2. Merits***."

10. On page 34, the subheading ***Insufficient Mitigation for Loss of Carbon Sequestration Capacity Due to Loss of Oak Woodlands*** is modified to read "***E. Insufficient Mitigation for Loss of Carbon Sequestration Capacity Due to Loss of Oak Woodlands.***"

11. On page 34, the subsection Exhaustion is modified to read "***1. Exhaustion***."

12. On page 39, the subsection ***Merits*** is modified to read "***2. Merits***."

13. On page 49, the subheading ***Water Usage Baseline*** is modified to read "***F. Water Usage Baseline.***"

14. On page 50, the subsection ***Exhaustion*** is modified to read "***1. Exhaustion***."

15. One page 58, the subsection ***Merits*** is modified to read "***2. Merits.***"

16. On page 65, subheading *Water Use Mitigation Measure* is modified to read "***G. Water Use Mitigation Measure.***"

17. On page 67, the subheading *Water Quality Impacts* is modified to read "***H. Water Quality Impacts***."

18. On page 68 the subsection Exhaustion is modified to read "***1. Exhaustion.***"

19. One page 72, subsection *Merits* is modified to read "***2. Merits.***"

20. On page 77 subheading, ***Consistency with General Plan*** is modified to read "***I. Consistency with General Plan.***"

21. On page 78 subsection ***Not A CEQA Issue*** is modified to read "***1. Not A CEQA Issue.***"

22. On page 83 subsection ***Merits*** is modified to read "***2. Merits***."

23. On page 85, **DISPOSITION** is modified to read "**III. DISPOSITION.**"

The opinion in the above-entitled matter filed on March 25, 2021, was not certified for publication in the Official Reports. For good cause, the requests for publication is granted in part.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105(b), the opinion in the above-entitled matter is ordered certified for publication, with the exception of parts II(C)-(H), in the Official Reports.

Date: _____ Presiding Justice

3

Trial Court:  Napa County Superior Court

Trial Judge:  Hon. Victoria Wood

Counsel:

Chatten-Brown, Carstens & Minteer LLP, Amy C. Minteer, Michelle N. Black and Sunjana Supekar for Petitioner and Appellant.

Napa County Counsel, Jeffrey M. Brax, Laura J. Anderson and Christopher Y. Apallas for Respondent County of Napa.

Baker Botts LLP, Christopher J. Carr and Navtej S. Dhillon for Respondent and Real Parties in Interest Syar Industries Inc.